**Sylvia CARTER, Marilyn Goldstein, Marian Leifsen and Jane McNamara, on behalf of themselves and all others similarly situated, and Nassau County Printing Pressmen and Assistants' Union, Local 406, AFL–CIO, Plaintiffs,**

v.

**NEWSDAY, INC., Defendant.**

No. 75 Civ. 52.

United States District Court,
E. D. New York.

Oct. 1, 1981.

Pamela M. Isackes, Walter M. Meginniss, Jr., National Employment Law Project, Inc., Diane Serafin Blank, Gordon & Shechtman, P.C., New York City, for plaintiffs.

Weil, Gotshal & Manges, New York City, for defendant; Mark A. Jacoby, Donald I. N. McKenzie, Rachel A. Ostow, New York City, of counsel.

BARTELS, District Judge.

This is a motion by the defendant Newsday, Inc. for partial summary judgment in a non-jury case involving an across-the-board attack by four named plaintiffs, representing a class of some fifteen thousand women, on all of Newsday's employment practices, on the grounds of sex discrimination in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.* The original complaint was filed on January 13, 1975, and an amended complaint was filed on February 18, 1975. The nature of the attack has been fully set forth in the Court's class certification opinion. *Carter v. Newsday, Inc.,* 76 F.R.D. 9 (E.D. N.Y.1976), familiarity with which is assumed. The class of individuals certified therein was defined as:

> (1) all female employees of Newsday who have been employed since March 1, 1973, and all who may be employed in the future, and (2) all female applicants for positions at Newsday since March 1, 1973, and all who may apply in the future.

*Carter v. Newsday, Inc.,* 76 F.R.D. at 15–16. The cut-off date of March 1, 1973 was chosen as falling 300 days prior to the filing of charges of discrimination against Newsday

with the Equal Employment Opportunity Commission. *See id.* at 15.

Newsday's motion papers, pursuant to Rule 56, F.R.Civ.P., and Rule 9(g) of the General Rules of the Eastern District of New York, set forth various factual grounds for its argument that summary judgment should issue in its favor. The motion is limited to the plaintiffs' class claims represented by Marian Leifsen alleging disparate treatment in hiring in the editorial department. References are made to deposition testimony, and stipulations of fact entered into by the parties contained in the submission, on July 9, 1981, of the Joint Pretrial Order ("JPO") which will govern the trial of this case. Included in the same papers is an application by Newsday under Rule 23, F.R.Civ.P., for partial decertification of the class to exclude applicants for both editorial and non-editorial positions. Because the relief sought by Newsday in its decertification motion is conditioned, in part, on the determination of the summary judgment motion, we address the latter first.

## I.

### Summary Judgment

■ The Court realizes that in a sex discrimination suit, summary judgment will rarely be granted.

Courts are reluctant to dismiss by summary judgment Title VII discrimination suits where, as in antitrust actions, motive and intent are crucial elements and the proof is in the hands of the alleged wrongdoers.

*Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 759 (9th Cir. 1980); *see also Rodriguez v. City of Eastchester*, 620 F.2d 362 (2d Cir. 1980). Nevertheless, as in any protracted case of this type, it is necessary to screen out in advance sham issues and "discover whether one side has no real support for its version of the facts." *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962).

■■ We note also that summary judgment is only appropriate "when a review of

the entire record demonstrates that there is no genuine issue as to any material fact." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir. 1980); F.R. Civ.P. 56(c). In such a case the burden rests on the moving party to show the absence of genuine issues, and the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman v. Commerce & Industry Insur. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2d Cir. 1976); 10 Wright & Miller, *Federal Practice and Procedure* § 2727 (1973). The nonmovant may generate uncertainty as to the true state of any material fact by coming forth with affidavits or other discovery materials, but may not rely "upon the mere allegations or denials of his pleading." Rule 56(e), F.R.Civ.P. Nor may the nonmovant rely on deposition statements to the effect that the deponent "does not remember" a particular fact, as a means of putting that fact in issue. *See, e.g., Erickson v. Said*, 42 F.R.D. 170, 172 (S.D.N.Y.1967), where the opposing party "did not recall" whether or not a material fact was as stated by moving party.

We turn to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), for the test to make out a prima facie case of disparate treatment. The Supreme Court there held that a plaintiff makes out a prima facie case of disparate treatment by showing that: (1) she is a member of the protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons of her qualifications.

■ Thereafter the burden shifts to the employer to produce evidence of some legitimate, nondiscriminatory reason for the applicant's rejection. *Id.; Texas Dep't of Community Affairs v. Burdine*, 450 U.S.

248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). At that point the factual issue is narrowed down to the reasons for the applicant's rejection, in order to enable her to indicate that such reason was simply a pretext for discrimination. *Burdine*, 101 S.Ct. at 1095. She must show, in short, that her rejection for a job did not result from "the two most common legitimate reasons on which an employer might rely to reject a job applicant: [*i.e.*] an absolute *or relative lack of qualifications* or the absence of a vacancy in the job sought." *International Bro. of Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (1977) (emphasis added).

■ On its motion for partial summary judgment therefore, Newsday must show that no genuine issue exists as to the fact that there is a nondiscriminatory reason for its employment decisions in the editorial department during the relevant time period under consideration. *Reich v. New York Hospital*, 513 F.Supp. 854, 860 (S.D.N.Y. 1981). The crucial issue here involved is that of intent to discriminate. Any doubt as to the existence of a genuine issue of fact as to Newsday's intent must be resolved against the defendant. Thus, even if Newsday does show that there is no genuine issue of fact that a nondiscriminatory reason for its employment decisions exists, it must also establish that there is no genuine issue of fact that its stated reason for those decisions was not a pretext if the plaintiffs have established a prima facie case. *Id.* at 861; *McDonnell Douglas*, 411 U.S. at 804–06, 93 S.Ct. at 1825–1826. Newsday's burden is thus unquestionably a heavy one, and "[a]bsent the submission of extensive comparative material" the evaluation of employer intent would be difficult short of a trial. *Sobel v. Yeshiva University*, 477 F.Supp. 1161, 1167 (S.D.N.Y.1979). As will further appear, however, the Court

has available to it both extensive and undisputed data comparing application and hiring percentages at Newsday in the editorial department. *Cf. Reed v. Lockheed Aircraft Corp.*, 613 F.2d at 762 (summary judgment inappropriate where there was no statistical data in the record pending full discovery).

In considering this application the Court recognizes that as part of the record there exists for examination the result of extensive discovery conducted by the plaintiffs, as well as defendant Newsday's response to more than 230 interrogatories and requests for admission. In addition, pursuant to the Court's Order of December 13, 1978, both parties have secured statistical experts to conduct studies of Newsday's hiring, promotion, and salary practices, and their reports constitute part of the record in this case.[1] On May 29, 1981 the parties submitted thirteen exhibits (SX1–13) setting forth detailed stipulations as to data on Newsday's hiring and promotions.

■ In the JPO, consisting of over 1000 pages, the parties agreed that the "entire employment process for professional positions within the [editorial] department" is handled by that department alone, ¶ 189A, JPO at p. 273, in contrast to the hiring procedures for the other departments and positions at Newsday, which are handled by the employee relations department. ¶ 169A, JPO at p. 263. It is appropriate, therefore, for the Court to address the question of hiring discrimination in the editorial department on a motion for partial summary judgment, separate from the question of hiring discrimination in the other departments. In the Court's view, the issue on this motion is reduced to the question whether a genuine dispute exists that the percentage of female hires in Newsday's editorial department within the rele-

---

1. Plaintiffs have submitted amended and rebuttal statistical reports prepared by Dr. Bernard Siskin, Assoc. Professor at Temple University. Defendant has submitted reports on hiring and promotions prepared by Dr. Seymour Wolfbein, Boettner Professor at Temple University, and on wage analysis, prepared by Dr. Herbert Robbins, Higgins Professor at Columbia Uni-

versity. On January 16, 1981, the Court appointed its own expert, Dr. Jerry A. Hausman, Professor of Economics at the Massachusetts Institute of Technology. His report has not been adopted by either party and the Court has concluded that it is neither proper, necessary, nor relevant to consider that report upon this motion particularly in view of the stipulations.

vant time period sufficiently approached the percentage of female applicants for those positions, as to indicate without doubt a lack of discrimination in the hiring process.

### The Relevant Time Period

■ In assessing the sufficiency of plaintiffs' evidence it is necessary to determine a time frame within which to view that evidence. In its Order of September 22, 1976, the Court limited the plaintiff class to persons applying to or employed by Newsday from March 1, 1973 on. That date remains a critical reference point. The Supreme Court has made it clear that liability under Title VII requires a showing that some "present violation exists," where the "present" is defined as any time from the onset of the 300 days period forward. *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). *Evans* held that a discriminatory act which is not made the basis for a timely charge is, without more, merely an unfortunate event in history which has no present legal consequences. This principle is "fully applicable to pattern and practice claims." *Ste. Marie v. Eastern R. Ass'n*, 650 F.2d 395, 399–400 (2d Cir. 1981). Where, as here, the discriminatory act complained of is alleged to be a "continuously maintained illegal employment policy," a timely charge for purposes of *Evans* is one made within 300 days "after the *last occurrence* of an instance of that policy." *Acha v. Beame*, 570 F.2d 57, 65 (2d Cir. 1978) (emphasis in original); *accord, Guardians Ass'n of NYC v. Civil Service*, 633 F.2d 232, 249–51 (2d Cir. 1980).[2]

■ To determine the extent of the defendant's liability, the first step is to determine whether discriminatory acts were committed after March 1, 1973. For purposes of this motion, any evidence of pre- 1973 discrimination is only relevant if it supports "the inference that such discrimination continued, particularly where relevant aspects of the decisionmaking process [have] undergone little change." *Hazelwood School Dist. v. United States*, 433 U.S. 299, 309 n.15, 97 S.Ct. 2736, 2742 n.15, 53 L.Ed.2d 768 (1977). The Court reviews first the statistical evidence of hiring discrimination in the period March 1, 1973 through December 31, 1978,[3] as shown by the record.

### Statistical Evidence

■ Statistical analyses "have served and will continue to serve an important role" in establishing a prima facie case of sex discrimination. *International Bro. of Teamsters v. United States*, 431 U.S. at 339, 97 S.Ct. at 1856; *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). It is upon such evidence that the plaintiffs now rely in order to satisfy this burden. To establish an issue of discrimination, it is incumbent upon the plaintiff to demonstrate either (a) by a comparison of applications with hires in the editorial department that the percentage of hires was significantly less than the percentage of applications; or (b) by a comparison of the hires with an outside labor pool that the percentage of hires was significantly less than the percentage of qualified persons in the source pool. Statistical evidence showing significant disparities in the treatment of women is often the most accessible means of creating an inference of intentional discrimination. Such evidence is particularly useful to the trier of fact who is otherwise unable to form a meaningful picture of the manner in which large numbers of a plaintiff class have been treated. In *Hazelwood School Dist.*, 433 U.S. at 308 n.13, 97 S.Ct. at 2742 n.13, the Supreme Court stated that

---

**2.** The distinction between *Evans* and *Acha* is that in *Evans* the plaintiff challenged a practice which had stopped prior to the 300 day period, but had a continuing effect into that period; in *Acha*, the plaintiffs challenged acts taken pursuant to a policy which not only had its effects into the 300 day period, but also remained in existence during that period as well.

**3.** December 31, 1978 is, in effect, the cut-off date for evidentiary purposes, since no statistical reports were prepared by plaintiffs' expert for the period from January 1, 1979 to the present.

competent proof of applicant flow would be "very relevant" in assessing an employer's decisionmaking. "Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Id.* at 307–08, 97 S.Ct. at 2742.

The Court has been greatly aided in its review of the record by the considerable amount of data to which the parties have stipulated. Specifically, the parties have agreed that in the period January 1, 1974 through December 31, 1978, 123 persons were hired into professional positions in the editorial department, of whom 47, or 38.2%, were females, ¶ 330G, JPO at p. 410; SX–1, and that during the period March 1, 1973 through December 31, 1973, 17 persons were hired, of whom 5, or 29.4%, were females. SX–9.

Both parties have stipulated, with only minor disagreements, to the numbers of applicants for editorial positions as reflected in applicant logs maintained by the editorial department in processing the applications during the period January 1, 1974 through December 31, 1978. In doing so, however, the plaintiffs refused to accept the reliability of the logs. With this reservation, they claim that the total number of applicants so logged was 4910, of whom 1676, or 34.1%, were females. On the other hand, defendant contends that the total number is 4926, of whom 1690, or 34.3%, were females. SX–11. In order to further limit this data to indicate "qualified applicants" only, plaintiffs sought to eliminate from the total those applicants who were sent "No Jobs" or "Get Experience" form letters. So refined, the plaintiffs assert that the total number of qualified applicants was 1496, of whom 584, or 39%, were females. Defendant counters that the total was 1631, of whom 626, or 38.4%, were females. SX–12.

As an alternative comparison of statistics on the numbers of actual applicants for jobs, both parties have proffered sets of data for the percentage of females in the outside labor pools with the requisite skills and interests to be hired into Newsday's editorial department.[4] Plaintiffs contend that 46.4% of the persons eligible for such positions were females, *see* ¶ R330K, JPO at p. 417, while defendant contends that in fact only 29% of such persons were females. ¶ 334E, p. 416. Both sides compare their percentage figures for the outside labor pools to the percentage of females hired during 1974–78 (38.2%) in support of their respective contentions that women either were or were not discriminated against in editorial hiring. The existence of a genuine dispute as to the proper labor pool can of course be taken as established. But that dispute turns out to be moot, since both plaintiffs' and defendant's experts agree that reliable applicant flow data provides the best statistical method for assessing a company's hiring decisions. Siskin Depo. at p. 354; Wolfbein Rpt. at p. 14. Indeed, authorities agree that "widespread preference is accorded comparisons of the actual rates of hire with the actual rates of application when such evidence is available." *Greenspan v. Automobile Club of Michigan*, 495 F.Supp. 1021, 1055 (E.D.Mich.1980); B. Schlei & P. Grossman, *Employment Discrimination Law* 320 (1979 Supp.). The problem of resolving a factual dispute based upon the proper statistical methodology does not therefore arise on this motion, nor would it have arisen at trial. *Cf. Rosario v. New York Times*, 84 F.R.D. 626, 630 (S.D.N.Y.1979), where the court was faced with two conflicting methodologies.

As heretofore indicated, the plaintiffs have questioned the reliability of the defendant's editorial logs generally as a reflection of the actual numbers of applicants for positions in the editorial department.

**4.** Plaintiffs have also introduced so-called "snapshots" of the sexual composition of Newsday's workforce as of December 31, 1974, as a means of comparing the percentage of women at Newsday with their percentage in the outside workforce. Since this static analysis necessarily incorporates individuals hired by Newsday before the date of legal liability for discrimination, its probative value is open to serious question. *See Ste. Marie v. Eastern R. Ass'n*, 650 F.2d 395, 401 (2d Cir. 1981).

The essence of their dispute centers on a count they made of the files on unsuccessful applicants for the editorial department during the years 1974–77. These files, together with the personnel files for persons actually hired during that period, were made available to the plaintiffs by Order of this Court in 1978 as the underlying data on which the editorial logs purport to be based. According to their contentions as set forth in ¶ R292A, JPO at p. 395, a count of the files revealed "fewer than *half*" of the numbers of "news" applicants set forth by defendant in its applicant flow data derived from the logs. Specifically, plaintiffs contend that they counted only 1553 news applicants, of whom 511, or 32.9%, were females. The total of 1553 is less than one-half of the 3770 news applicants, whom plaintiffs agree were logged by Newsday for 1974–77. Of said 3770, or 35.5%, applicants 1338, or 35.5%, were females.

From this comparison, it becomes apparent that both tabulations show essentially the same percentage of female applicants. Nevertheless, plaintiffs assert that the simple fact of a difference in a total count between the logs and the applications they counted in the files indicates that *neither* the logs *nor* the files were reliably maintained. This is a nonsequitur. In order, however, to give the plaintiffs the benefit of any doubt, the Court felt that in a motion of this type a limited hearing into the process by which the logs were maintained and the application files were counted was advisable. Authority for such a hearing upon a summary judgment motion may be found in Rule 43(e), F.R.Civ.P.; 10 Wright & Miller, *Federal Practice and Procedure* § 2723; *accord* 6 Moore's *Federal Practice* ¶ 56.11[1–6]; *Hayden v. First Nat'l Bank of Mt. Pleasant, Texas*, 595 F.2d 994, 996 (5th Cir. 1979); *Williams v. City of San Francisco*, 483 F.Supp. 335, 338 (N.D.Cal.1979). *See also Burnham Chemical Co. v. Borax Consolidated*, 170 F.2d 569, 574–75 (9th Cir. 1948), *cert. denied*, 336 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086 (1949).

Accordingly, on September 18, 1981 such a hearing was held, in which the plaintiffs made a two-pronged attack on defendant's log books stating that (a) the number of applicants shown in the log books was erroneous; and (b) the classification scheme within the log books was faulty. At that hearing the Court received testimony from Dolores Haynes, plaintiffs' paralegal in charge of their file count, and Ken Brief, who as Assistant to the Editor both devised and originally maintained the editorial logs. His hiring and recording functions were later taken over by a series of successors from October 1974 on. The Court also received documentary evidence in the form of the log books themselves, as well as the various summaries used by the plaintiffs in arriving at their totals. There was no credibility issue, because there was no conflict in the versions of both witnesses as to what they did. The evidence showed conclusively that the discrepancy between plaintiffs' and defendant's counts was due to differences in how each side classified applicants, and *not* to any difference between the total number of persons logged and the total number of applications examined by the plaintiffs.

The Court found the log books were admissible under Rule 803(6), F.R.E. Plaintiffs, through their counsel, using counsel's own judgment as to who was and who was not applying for editorial positions, made an analysis of the applicant files underlying the log books which was different from the determination of Ken Brief. The log books showed entries for name, sex, position sought, and Newsday's reply. The logs in the editorial department included persons explicitly requesting news jobs, plus a certain number of persons showing qualifications for positions in the sports department, who Newsday also considered as applying for jobs in the news department, plus a number of applications from persons seeking jobs at Newsday specifying their qualifications, but not necessarily the job title desired. Plaintiffs excluded these latter two categories from the total of "news" applicants, and consequently reduced the number of applications recorded in defendant's news logs from 3770 to 1553. But the files for all were there. When the number

of (i) "sports" applicants found by plaintiffs in the files (68) is added to the number of (ii) applicants described by the plaintiffs as "unspecified" applicants (1896), the number of (iii) "news" applicants (1553), and the number of (iv) persons stipulated to have been hired in the news department during 1974–77 (102), the total is 3619, which was agreed to by the plaintiffs. But plaintiffs' file count total of 3619 is 96% of the 3770 persons plaintiffs agreed were recorded in the logs, a discrepancy without any significance for purposes of determining reliability. This is not a case like *EEOC v. American Nat'l Bank*, 652 F.2d 1176 (4th Cir. 1981), where defendant's applicant flow data was rejected, as representing only *half* of the actual applicants. Plaintiffs' claim that only half of the news applications recorded in the logs were contained in the files is simply not true.[5]

■ The second attack on the validity of the logs is that the defendant's categorization of the male and female applicants for editorial positions was inaccurate. To raise a genuine issue of fact, plaintiffs must demonstrate that the allegedly tainted data in the logs was less likely to reveal "discrimination than would correct and complete data." *Vuyanich v. Rep. Nat'l Bank of Dallas*, 505 F.Supp. 224, 256 (N.D.Tex.1980). Assuming that the classification scheme of the plaintiffs' attorneys was more accurate than that of Newsday's officer, 1553 persons applied for news positions, of whom 32.9% were female. Instead of being able to demonstrate a flaw in the percentages reflected in the logs, the plaintiffs succeeded in corroborating the same. *See id.* at 255. Plaintiffs added nothing to the cre-

ation of a genuine issue of fact by showing evidence of four instances in which three males and one female (evidence actually diluting the percentage of female applicants) were classified by Ken Brief as news applicants, whom plaintiffs' counsel would classify as applicants for jobs other than on the news staff. Absolute perfection in the logs is unobtainable, inasmuch as the nature of an applicant's petition for a position is often broad enough to be included in more than one job category. Under the circumstances, the Court concludes that the log books were and are reliable.

■ Considering the percentage of female applicants, 32.9%, as compared to the percentage of females hired from 1974–77, 38.2%, there is no doubt that females were hired in excess of their representation in the source pool. Thus plaintiffs have failed to make out a prima facie statistical case of discriminatory treatment in hiring in the editorial department. If anything, they have shown the opposite.

Plaintiffs argue that if the Court accepts, as it has, the reliability of the logs, only 1496 applicants survived as eligible for consideration as qualified applicants to the editorial department, after Newsday had sent out its "No Jobs" or "Get Experience" form letters. Of these 1496, 584, or 39%, were females. SX–12. As compared to the 38.2% females actually hired, it is impossible to obtain statistically significant results on a total of the 123 hired from January 1, 1974 to December 31, 1978, inasmuch as the observed disparity is only .18 standard deviations,[6] which is far below the "two or three

5. Plaintiffs were too quick in making a charge predicated upon their scheme of classification, that half the applicant files were "no longer in existence", Status Conf. of 2/26/81 (Tr. at 28–9), and thereafter adhering to the charge without further investigation.

6. The "standard deviation" is a mathematical measure of the degree to which an observed result diverges from an expected result. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 308–09 n.14, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977); *Vuyanich v. Rep. Nat'l Bank of Dallas*, 505 F.Supp. 224, 351–52 n.162 (N.D.Texas 1980). The difference between the

selection rates for men and women in the editorial department would have no significance even under a theory of disparate impact. *See* Dep't of Justice Guidelines on Employee Selection, 28 C.F.R. § 50.14, section 3D (1980): "A selection rate for any race, sex, or ethnic group which is less than four-fifths ($\frac{4}{5}$) (or eighty percent) of the rate for the group with the highest rate will generally be regarded ... as evidence of adverse impact." Applying this formula to the stipulated data, the group with the highest selection rate was women, not men, since during 1974–77 only 2.86% of the men who applied to the editorial department were

standard deviation" approach adopted by the Supreme Court in *Castaneda v. Partida*, 430 U.S. 482, 496 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977); *see also Vuyanich*, 505 F.Supp. at 348.

Finally, the plaintiffs suggest that the unavailability of applicant flow data for the ten-month period from March 1, 1973 through December 31, 1973 alters the conclusion that plaintiffs have failed to present a prima facie case of disparate treatment. During that period only seventeen persons were hired, of whom five, or 29.4%, were females. When one compares the hiring rate of 29.4% with the maximum applicant flow rate of 39% cited above, the disparity is only .81 standard deviations. It is not surprising, therefore, when the data is aggregated for the entire period from March 1, 1973 through December 31, 1978, statistically insignificant results are likewise obtained. The total number of hires stipulated to during that period was 140, of whom 52, or 37.1%, were female. Comparison with the applicant rate of 39% shows a disparity of only .46 standard deviations.

The Court finds, therefore, that a comparison of the number of women hired at Newsday in the editorial department from March 1, 1973 through December 31, 1978 with the applicant data most favorable to the plaintiffs, yields no evidentiary basis for any inference of sex discrimination during that period. This does not, however, end the plaintiffs' claims. They contend that there is other evidence supporting their position which the Court will proceed to discuss.

### Anecdotal Evidence

■■■■ Anecdotal testimony is a valuable tool in bringing "the cold numbers convincingly to life." *International Bro. of*

*Teamsters v. United States*, 431 U.S. at 339, 97 S.Ct. at 1856. Such testimony affords the court the opportunity to see reflected in individual cases the policies alleged to exist on a general scale. In the case, however, of a showing of nonexistent statistical discrimination, anecdotal testimony must by itself support an inference of sex-based hiring decisions. *Ste. Marie*, 650 F.2d at 405. In a class action alleging disparate treatment, the proof must show that sex discrimination "was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855.

■■■ Here, plaintiffs have offered the testimony of Marian Leifsen, a named plaintiff, and K. C. Cole, as set forth in depositions, as support for their allegations of sex discrimination. As the Court of Appeals held in *Ste. Marie*, "more than two acts will ordinarily be required" to establish a pattern or practice of discrimination. 650 F.2d at 406. Such acts under those circumstances are not offered as confirmation of the existence of a policy otherwise proved, but are themselves alleged to provide the basis for inferring the existence of that policy. Even were Leifsen and Cole able to establish discriminatory treatment with respect to their individual applications, these two "isolated incidents", without more, would be insufficient to establish a prima facie case of the existence of a practice of hiring discrimination.

■■■ Assuming, *arguendo*, that two acts are sufficient for the purpose, the Court finds without any doubt that Leifsen and Cole have failed to establish a prima facie case. Referring to Leifsen, even if she were qualified for the job for which she applied,[7] Newsday's explanation that she

---

hired, whereas 3.43% of the women who applied were hired. SX–1, 3, and 11.

7. The Court notes, however, that Leifsen's qualifications for the job were never established as part of her prima facie case. On the one hand, she vigorously contends that the copy-editing test proffered in discovery by Newsday as hers, DX–107, is not her test, an understandable position given the fact that

DX–107 is replete with errors of logic and grammar. On the other hand, Leifsen has not proffered any other copy-editing test as showing a competent performance on her part, nor has she moved to compel the production of such a test. Plaintiffs have stipulated that copy-editing tests were routinely given to applicants who, like Leifsen, had no prior daily newspaper experience. ¶ 189G, JPO at p. 277. Any subsequent offer for a "try-out" for an

was rejected in favor of more qualified persons was plainly not a pretext for discrimination, since of the next three persons hired from the time of her application to her final rejection on January 30, 1974, two were women, and one was a male who had eleven years' experience on a daily newspaper. Plaintiffs do not seek to show that Leifsen was more qualified than that male. The *Burdine* Court clearly stated that "the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." 101 S.Ct. at 1096–97. In *Griggs v. Duke Power Company*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), the Supreme Court specifically noted that "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications."

As to Cole, it is stipulated that she applied to Newsday for a job as an editor on May 8, 1974. Her application form so stated, and she was in fact interviewed for that position, given a copy-editing test, and offered a try-out position as a copy editor on the news desk. Following the try-out, which plaintiffs agree is a "standard newspaper procedure", ¶ 189J, JPO at p. 281, Cole was hired as an assistant editor. Plaintiffs' only contention with respect to the alleged discriminatory treatment of K.C. Cole is that even though she announced that she wanted an "upper level editing position", she was told that she

could only apply for a position as a copy-editor. ¶¶ 328, R328, JPO at p. 473. Nowhere is plaintiffs' contention supported by reference to deposition testimony, affidavits, answers to interrogatories, or other discovery material, as required under Rule 56(e) in opposing a motion for summary judgment. *See* Ptfs' Statement Pursuant to Rule 9(g), ¶¶ 48–9. Moreover, plaintiffs have failed to show by factual evidence either that an upper-level editing position was open at the time K. C. Cole applied, or that if it was, a male with lesser qualifications was hired for the job after Cole's "rejection". *See* ¶¶ 326, 329, JPO at pp. 467, 473, where factual reference is made only to proposed trial testimony, a factual basis which is inadequate under Rule 56(e). The Court must therefore conclude that no disputed issue exists as to the position Cole applied for. Since she was promptly hired for the position she applied for, there can be no claim that she was discriminated against in the hiring process.[8]

*Other Evidence*

Plaintiffs' other evidence of alleged discrimination has two branches: (a) the use of subjective criteria in the hiring process; and (b) evidence of a pattern or practice of discrimination for the period preceding March 1, 1973. As to the first contention, we refer to the statement in *Ste. Marie* to the effect that when "rele-

---

editor position would thereafter be made on the basis of test performance, prior experience, education, etc. ¶ 197, JPO at p. 280.

**8.** Plaintiffs have also proposed the testimony of Elaine Hess and Eileen Swift to show the existence of hiring discrimination. Both, however, applied for jobs prior to March 1, 1973. Hess received a final rejection on February 15, 1973. Although plaintiffs belatedly contend that her application was still "viable" after March 1, 1973, they only proffer as factual support for that contention the closing sentence in the rejection letter which advises the applicant that "[t]he situation may change and if so we'll be in touch." PX–146. It would be unreasonable to take that form letter statement as continuing life to a clearly rejected application. Swift, on the other hand, applied for a job as a reporter on May 22, 1958, and was hired the next day directly onto the women's page staff. Swift's

experiences, falling prior to the passage of the Civil Rights Act, are at best relevant only as background. In view of the fact that Swift was placed in a "soft" rather than a "hard" news position, the plaintiffs treat her placement as hiring discrimination. However, from the outset of this case, the plaintiffs have tried the placement and routing claims separately from the hiring claims. *Compare* Amended Complaint, Count One (hiring) *with id.*, at Count Six (job assignments/routing). *See also* Vol. II, JPO, where the plaintiffs separately set forth their Factual Contentions #'s 1–12 under the heading "A. Failure to Hire", and #'s 12–26 under the heading "B. Initial Placement and Routing." No proof or evidence has been offered or suggested showing any connection between alleged discriminatory hiring and alleged discriminatory routing.

vant statistics are lacking and the probative evidence of discrimination is confined, as we are assuming, to [two] individual incidents, subjective decisionmaking methods are not sufficient to establish a pattern or practice of discrimination; all that could be inferred is that their potential has been actualized in the same [two] cases." 650 F.2d at 405. Thus no further inference of discrimination can be drawn with respect to other persons. The use of subjective criteria alone in evaluating applicants does not necessarily taint the hiring process. This is particularly true when the hiring process of persons for sophisticated positions depends on experienced judgment, and there is no other objective evidence indicating a difference in treatment.

■ The essence of the second branch of plaintiffs' claim is that if there was evidence of a pattern or practice of discrimination during the period preceding March 1, 1973, there must have been discrimination in the period following. This is not true unless there is evidence of violations which occurred within the limitations period. *Reed v. Lockheed Aircraft Corp.,* 613 F.2d at 760. Here sizeable numbers of women were being hired into Newsday's editorial department after March 1, 1973, in essentially the same percentages as they applied. Plaintiffs concede, as they must, that viewed by itself, the hiring data from March 1, 1973 through December 31, 1973 shows no disparities of statistical significance. *See* Ptfs' Memo at p. 35. The plaintiffs nevertheless argue that since the 29.4% hiring rate during those months was somewhat lower than the hiring rate during 1974–78, the difference reflects "a continuation of defendant's earlier discriminatory hiring practices." This of course does not follow. This is a circular argument predicated upon the assumption that there were post-March 1, 1973 violations representing a continuation of prior violations. These assumed violations were used by the plaintiffs

as a basis for the introduction of the prior violations. In referring to the doctrine of a continuing violation, the Supreme Court in *Evans* stated: "But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists." 431 U.S. at 558, 97 S.Ct. at 1889.

■ Plaintiffs' argument misconceives the thrust of the continuing violation theory, which is only a recognition that an employer cannot escape liability for discriminatory conduct occurring before the limitations period if he chooses to continue the same into that period. The Second Circuit has noted that the plaintiff is required to show that the violation is " 'still fresh' within the statutory period," *Ass'n Against Discrimination v. City of Bridgeport,* 647 F.2d 256, 274 (2d Cir. 1981), before evidence of any earlier conduct is admissible on the question of liability. The fact is that the post-March 1, 1973 data does not show statistically significant underutilization of women.

Even assuming that evidence relating to the period prior to the filing of EEOC charges on December 26, 1973 is relevant in determining whether the March 1, 1973 to December 31, 1973 data shows an underutilization of women, the stipulated hiring data for the period from January 1, 1972 through February 28, 1973 shows a total of 61 hires, of whom 22, or 36.1%, were women, a rate perfectly in accord with the hiring rate of 37.1% from March 1, 1973 through December 31, 1978. *See* SX–9. The somewhat lower 29.4% hiring rate in the latter part of 1973 is the result of the small sample size of seventeen persons, and not of any "continuation of defendant's earlier discriminatory practices." [9] *See* D. Baldus and J. Cole, *Statistical Proof of Discrimination* § 9.12 (1981 Supp.). Plainly this case falls outside of the parameters of

---

**9.** It may be observed that if the hiring rate of the seventeen hired during the period had been six women and eleven men, instead of five women and twelve men, the percentage jumps from 29.4 female to 35.3 female. Where so

small a change as one person makes so great a difference, it would be error to view the statistics in isolation, as comparison with the data from January 1, 1972 on indicates.

the "continuing violation" theory, since there was neither evidence of discrimination prior to the onset of the limitations period on March 1, 1973, nor was there evidence of such discrimination afterwards. This case stands in contrast to such cases as *Ass'n Against Discrimination*, 647 F.2d at 275, where there were "express findings as to several discriminatory acts by the [defendant] that occurred within [the relevant period]."

## II.

### Application for Partial Class Decertification

█ Having made the foregoing determinations, the Court proceeds to Newsday's application for decertification of the plaintiff class to exclude all applicants for non-editorial positions. Since there was no discrimination in the editorial department hires, the only question remaining is whether Leifsen or some other named plaintiff may continue to represent the non-editorial applicants. The applicable standard appears in *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). There the Supreme Court held that an adequate representative within the meaning of Rule 23(a), F.R.Civ.P., is one who "possess[es] the same interest and suffer[s] the same injury as the class members." Leifsen failed in her individual claim and in her alleged representation of the class of editorial department applicants. In no other respect has she shown that she suffered injury at Newsday's hands. In this context the only interest Leifsen could conceivably have as a representative apart from her status as a named plaintiff is as the representative of the non-editorial applicants. Since Leifsen did not apply for a non-editorial position, her remaining interest is highly theoretical, given the complete separation of the hiring processes between the editorial and non-editorial portions of Newsday. The risk to the non-editorial class members of having their claims prosecuted by a named plaintiff who has already failed on the only issues directly concerning her is too great. Leifsen would not therefore satisfy the typicality requirements of Rule 23(a) as required by *Rodriguez*. *See Richardson v. Coopers & Lybrand*, 82 F.R.D. 335, 337 (D.D.C.1978) (non-professional plaintiffs were inadequate representatives of professional staff).

█ Plaintiffs offer the further suggestion, however, that Carter, Goldstein, or McNamara might serve as representative of the non-editorial applicants on an "across-the-board" theory. But decisions in practically every circuit considering the matter after *Rodriguez* have concluded that unsuccessful applicants are ill-represented by such current and former employees, at least without a showing that the employees themselves had suffered from hiring discrimination, no evidence of which have they proffered. *See, e.g., DeGrace v. Rumsfeld*, 614 F.2d 796, 809–10 (1st Cir. 1980); *Abron v. Black & Decker, Inc.*, 654 F.2d 951 (4th Cir. 1981); *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300 (5th Cir. 1980); *see also Thompson v. American Chain & Cable Co.*, 84 F.R.D. 406 (D.Conn.1979). Thus none of the three named plaintiffs in addition to Leifsen can serve in the capacity of a representative for the non-editorial applicants.

█ Newsday's counter-suggestion, however, that the balance of the applicant class must be decertified is equally untenable. It is not a necessary corollary from the inadequacy of the four current named plaintiffs as representatives of that subclass. As the Court stated in *Rodriguez*, "the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims." 431 U.S. at 406 n.12, 97 S.Ct. at 1898 n.12. As remarked in *Sledge v. J. P. Stevens & Co.*, 585 F.2d 625, 634 (4th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979), "the failure of

the personal claims of the class representative does not debar the previously certified Rule 23(b)(2) class." *See also Franks v. Bowman Transp. Co.*, 424 U.S. 747, 752–57, 96 S.Ct. 1251, 1258–1260, 47 L.Ed.2d 444 (1976).

Accordingly the Court will permit one of the non-editorial applicant class members to come forward and prosecute the action as a class representative for the non-editorial applicant claims. *Armour v. City of Anniston*, 622 F.2d 1226 (5th Cir. 1980); *cf. Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975), holding that class members have a legal status separate from the interest asserted by the class representative.

## Conclusion

The Court concludes that Newsday's motion for partial summary judgment dismissing named plaintiff Marian Leifsen's individual claim of sex discrimination in editorial staff hiring, and dismissing plaintiffs' pattern and practice claim of sex discrimination in editorial staff hiring should be and hereby is GRANTED.

It is the Court's further conclusion that Newsday's application to modify the class certification to exclude all female applications for non-editorial staff positions should be and hereby is DENIED, with leave to renew in case plaintiffs are unable to come forward with the necessary representative of the non-editorial applicants.

SO ORDERED.