**UNITED STATES of America, Plaintiff-Appellant and Cross Appellee,**

v.

**EARTH SCIENCES, INC., Defendant-Appellee and Cross Appellant.**

Nos. 77–1302, 77–1303.

United States Court of Appeals, Tenth Circuit.

Argued Aug. 11, 1978.
Decided May 23, 1979.

Michael A. McCord, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Washington, D. C., Joseph F. Dolan, U. S. Atty., Lena A. Wilson, Asst. U. S. Atty., Denver, Colo., and Raymond N. Zagone, Atty., Dept. of Justice, Alan W. Eckert, Deputy Associate Gen. Counsel, Environmental Protection Agency, Washington, D. C., with him, on brief), for the United States.

Richard P. Holme of Davis, Graham & Stubbs, Denver, Colo., for Earth Sciences, Inc.

Sharon S. Metcalf, Asst. Atty. Gen., Denver, Colo., for the State of Colorado, amicus curiae.

J. D. MacFarlane, Atty. Gen., Gregory J. Hobbs, Jr., First Asst. Atty. Gen., Sue Ellen Harrison, Asst. Atty. Gen., Denver, Colo., V. Frank Mendicino, Atty. Gen., Cheyenne, Wyo., and K. W. James Rochow, Asst. Atty. Gen., Harrisburg, Pa., filed an amicus curiae memorandum in support of the United States.

Edward L. Strohbehn, Jr., Natural Resources Defense Council, Washington, D. C., filed an amicus curiae brief in support of the United States.

Before SETH, Chief Judge, and DOYLE and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal from a district court order dismissing a suit brought by the United States against Earth Sciences, Inc., (Earth Sciences) under the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251 *et seq.*, specifically § 1311.

The government appeals the district court's conclusion that the FWPCA ex-

empts all mining activities from point sources regulation. Earth Sciences cross-appeals, and defends the trial court's decision on the alternative grounds that Earth Sciences' overflows were not from a "point source," the stream involved in this case was not a "navigable water" under the Act, no person made a "discharge" of the pollutant at issue here, and the government suit was precluded by a prior choice to pursue administrative remedies.

The events which gave rise to this action occurred at Earth Sciences' gold leaching operation on the Rito Seco Creek in Costilla County, Colorado, and were stipulated by the parties. Gold leaching is a process whereby a toxic substance, here a sodium cyanide-sodium hydroxide water solution, is sprayed over a "heap" of gold ore, separating the gold from the ore. The leachate solution is then collected and the gold extracted for commercial sale. The center of Earth Sciences' operation is a 3½- to 4-acre pile of gold ore on top of an impermeable plastic membrane and 12 inches of sand constructed with a gradual slope, causing the leachate solution to funnel to one end into a small fiberglass-lined pool, called the primary sump. The solution is pumped from the primary sump into a processing trailer where the gold is removed, and then back onto the heap or into the primary sump. A 168,000-gallon reserve sump is available to catch excess leachate or runoff in emergency situations. The entire operation consists of several open excavations lined with plastic membrane, the processing trailer and pumps, all designed to be a closed system without any pollutant discharge.

Warm April temperatures caused faster melting than expected of a blanket of snow covering the heap, filling the primary and reserve sumps to capacity. This caused a one- to five-gallon-per-minute discharge of the sodium cyanide-sodium hydroxide leachate solution into the Rito Seco Creek for about a six-hour period. The solution is stipulated to be a pollutant under the FWPCA. Earth Sciences did not report the discharge to either state or federal environmental authorities.

A few days later the Colorado Division of Wildlife received a report of dead fish on the Rito Seco, causing a state inspector and two other wildlife employees to visit the Earth Sciences site. The inspector interviewed Earth Sciences employees and verified that a discharge had occurred. While the state employees were photographing and taking water samples of the operation, the reserve sump overflowed a second time, discharging approximately ten gallons per minute into the Rito Seco for two hours, until a bulldozer was used to construct a dirt berm around the edge of the reserve sump to stop the flow. Within a week Earth Sciences constructed another reserve sump with an additional capacity of 398,000 gallons.

Because the FWPCA encourages use of approved state enforcement procedures, 33 U.S.C. §§ 1316(c) and 1319(a)(1), the Environmental Protection Agency (EPA) requested the Colorado Department of Health to act to prevent further discharges. The state notified Earth Sciences it had violated Colo.Rev.Stat. § 25–8–501 (1973), which requires a permit to discharge pollutants, and Colo.Rev.Stat. § 25–8–601(2) (1973), allowing for criminal penalties if a discharge is not reported. Colorado ordered Earth Sciences to cease and desist from further illegal discharges and to "perform any work necessary to prevent future unauthorized discharges" or stop its operation. Earth Sciences notified the Department of Health the newly-constructed reserve sump in combination with existing facilities would "accommodate 1.6 times as much water" as would fall on the heap in any 24-hour period, based on maximum rainfall statistics in the area since 1951. The state did not initiate any criminal prosecution.

Apparently the EPA decided the Colorado enforcement was insufficient and issued its own notice of violation and cease and desist order under 33 U.S.C. § 1319(a)(3), which reads as follows:

Whenever on the basis of any information available to him the Administrator finds that any person is in violation of

section 1311, . . . he shall issue an order requiring such person to comply with such section or requirement, or he shall bring a civil action in accordance with subsection (b) of this section.

The EPA notice informed Earth Sciences the cyanide solution discharges violated 33 U.S.C. § 1311(a), because Earth Sciences had not applied for and been granted a permit to discharge pollutants under 33 U.S.C. § 1342. The notice identified an open ditch between the reserve sump and the Rito Seco Creek as a point source, defined in 33 U.S.C. § 1362(14) as

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

Contrasted with the state order, the EPA order was substantially more detailed and required Earth Sciences submit a plan to assure future discharges would not occur.

Five days after the EPA order was issued a sampling team of two EPA employees visited the Earth Sciences site. Groundwater seeps of approximately one gallon per minute were observed below the sumps running toward the Rito Seco and partially gathering into pools near the creek. Samples taken from two of these pools were found to contain cyanide.

Earth Sciences' compliance with the EPA order reaffirmed the capacity of the reserve sump system against maximum recorded precipitation, and identified several steps Earth Sciences would take to divert the natural runoff away from the leaching facilities. Earth Sciences also assured the EPA it would monitor groundwater seeps around the sumps and the quality and quantity of the runoff.

Soon thereafter the United States filed suit, alleging Earth Sciences committed three separate violations of FWPCA, one each time the reserve sump overflowed and one as a result of the tests on the water collected from the groundwater seeps. All three violations were asserted under 33 U.S.C. § 1311(a).

The matter came before the district court on opposing motions for summary judgment. The hearing was brief, focusing primarily on the court's concern that Earth Sciences' discharges were not conveyed to the Rito Seco by means of a point source, as that term is defined in the Act, section 1362(14) quoted above. Whether a discharge is made through a point source is crucial for application of enforcement provisions of FWPCA because pollutants discharged through point sources are regulated by effluent limitations and require a permit. Because nonpoint sources of pollution, such as oil and gas runoffs caused by rainfall on the highways, are virtually impossible to isolate to one polluter, no permit or regulatory system was established as to them. Rather, the EPA is instructed under 33 U.S.C. § 1314(f) to develop

> (1) guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollutants, and (2) processes, procedures, and methods to control pollution resulting from—
> (A) agricultural and silvicultural activities, including runoff from fields and crops and forest lands;
> (B) mining activities, including runoff and siltation from new, currently operating, and abandoned surface and underground mines;
> (C) all construction activity, including runoff from the facilities resulting from such construction; . . .

Based on its reading of the legislative history, the district court interpreted § 1314(f) as exempting those activities listed in (2) from the FWPCA enforcement provisions, due to their character as nonpoint source polluters. After the court decided Earth Sciences' gold leaching facility was a mining activity, dismissal of the government's suit followed because the government no longer had any enforcement power under § 1311(a) to bring a civil action. Appellant United States contends the district court's conclusion is an incorrect interpretation of the law.

## I

The United States argues discharges from mining activities often may be from nonpoint sources, but it is possible pollutants will be conveyed through a point source and be subject to regulation under the Act. Initially, the government argues, the definition of a point source does not exclude mining activity; the district court interpolated an exemption from the structure of § 1314(f). The United States contends that if Congress wanted to exempt all activities in § 1314(f)(2) because they are listed after subpart (1), it would not have done so ambiguously by placing the exemption in a general instruction section of the statute. It further points out that Congress rejected an amendment that would have explicitly regulated mining discharges from point sources, because it was duplicative of the Act's general regulatory provisions. Congress also debated and eventually adopted an amendment exempting irrigation discharges because those would have been included under general point source regulations.

Congressional intent behind FWPCA was to eliminate "discharge of pollutants into the navigable waters" of the United States by 1985. 33 U.S.C. § 1251. The EPA was instructed to promulgate regulations within a year governing effluent limitations for point source regulation. 33 U.S.C. § 1314(b). Because the agency had not issued those regulations within a year, a suit was brought forcing them to do so, the result being that a federal district court established a timetable for EPA compliance. *Natural Resources Defense Council, Inc., v. Train,* 6 E.R.C. 1033 (D.D.C.1973), *aff'd in part, rev'd in part on other grounds,* 166 U.S.App.D.C. 312, 510 F.2d 692 (1975). That court order included mining activities as a category for EPA regulations.

In fact the EPA has promulgated extensive regulations covering mining, 40 C.F.R. pt. 434, 436 and 440 (1977), and more than 6,000 discharge permits have been applied for or received by mining operations. Amicus Brief of The Natural Resources Defense Council, p. 14, citing EPA statistics. In a suit challenging the EPA's authority to exclude all silvicultural and certain agricultural discharges from point source regulation, two of the categories listed in § 1314(f), the United States Court of Appeals for the District of Columbia held, "The wording of the statute, legislative history, and precedents are clear: the EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of § 402." *Natural Resources Defense Council, Inc. v. Costle,* 186 U.S. App.D.C. 147, 155, 568 F.2d 1369, 1377 (1977). The D.C. Circuit agreed with the district court in that case "that the power to define point and nonpoint sources is vested in EPA and should be reviewed by the court only after opportunity for full agency review and examination." 186 U.S.App. D.C. at 160, 568 F.2d at 1382. At least one district court has stated point source regulation may apply to mining, but that mining activities often cause nonpoint source pollution which is not regulated by the Act. *Sierra Club v. Abston Constr. Co., Inc.,* 10 E.R.C. 1416, 1420 (N.D.Ala.1977).

Any time a comprehensive Congressional regulatory program is enacted the legislative history is relevant for determining Congressional intent. In another context we have noted the legislative history behind the FWPCA "does not help us much." *American Petroleum Inst. v. EPA,* 540 F.2d 1023, 1027 (10th Cir. 1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977). But in our view the government has the better of the arguments on legislative history.

We are impressed by the rejection of the proposed Hechler amendment on mine water wastes, as being based upon the view mining was already covered by the proposed Act (*See* Staff of Senate Comm. on Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972, 530–535 (Comm. Print 1973)); the debate and later adoption of the irrigation water exception from the definition of point sources in 33 U.S.C. § 1362(14) as being necessary to prevent it from being covered by the permit

requirements (*Id.* 651–653); and the fact the FWPCA's permit program superceded the Refuse Act's permit program while preserving its general prohibition against unpermitted discharges (33 U.S.C. §§ 1342(a)(5); 1371(a)). The Refuse Act has been held to prevent unpermitted discharges of mining wastes. *See Reserve Mining Co. v. EPA,* 514 F.2d 492, 529–532 (8th Cir. 1975), *modified,* 529 F.2d 181 (1976); *United States v. Valley Camp Coal Co.,* 480 F.2d 616 (4th Cir. 1973).

The legislative history indicates[a] to us Congress was classifying nonpoint source pollution as disparate runoff caused primarily by rainfall around activities that employ or cause pollutants. The Senate Report discussion of what became 33 U.S.C. § 1314, contains the following statements:

Sediment, often associated with agricultural activities, is by volume our major pollutant, not only from the degrading effect of the sediment, but because it also transports other pollutants. Fertilizer and pesticide runoff are also major agricultural non-point sources. Poor forestry practices, including indiscriminate clear cutting, may also generate substantial soil erosion problems.

. . . . .

One of the common problems associated with pollution control is the dramatic increase in storm runoff when the earth's surface is made impermeable. Thus highways, building, and parking lots all contribute substantially to the accelerated runoff of rainwater into natural water systems. The greater volume and greater velocity produced cause high rates of erosion and siltation. In addition, highway runoff often includes oil, rubber particles, lead, asbestos and other elements or additives deposited on highways as a result of vehicular traffic.

Legislative Hist., *supra,* 1470–1471.

■ Beginning with the Congressional intent to eliminate pollution from the nation's waters by 1985, the FWPCA was designed to regulate to the fullest extent possible those sources emitting pollution into rivers, streams and lakes. The touchstone of the regulatory scheme is that those needing to use the waters for waste distribution must seek and obtain a permit to discharge that waste, with the quantity and quality of the discharge regulated. The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States. It is clear from the legislative history Congress would have regulated so-called nonpoint sources if a workable method could have been derived; it instructed the EPA to study the problem and come up with a solution.

■ We believe it contravenes the intent of FWPCA and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point. Therefore, we hold the district court erred interpreting 33 U.S.C. § 1314(f) as enumerating nonpoint source exemptions from FWPCA enforcement regulations. Mining and the other categories listed in § 1314(f)(2) may involve discharges from both point and nonpoint sources, and those from point sources are subject to regulation.

## II

Earth Sciences raises four additional issues, each of which it argues independently supports the district court's judgment of dismissal of the government action. These issues were asserted below in Earth Sciences' motion to dismiss the government's suit six months before summary judgment was granted. The contentions are: (1) overflows from Earth Sciences' mining operations were not from any "point source"; (2) Earth Sciences made no "discharge" of pollutant into the creek; (3) the Rito Seco is not a "navigable water" subject to regulation under the Act; and (4) the statute requires the EPA pursue administrative remedies *or* file a civil action, but not both.

■ Earth Sciences' cross-appeal is proper because finality of the summary judgment order makes prior interlocutory orders

appealable under 28 U.S.C. § 1291. Also, we may affirm the granting of summary judgment if any proper ground exists, whether or not that formed the basis of the trial court's ruling. *Lindsey v. Dayton-Hudson Corp.,* 592 F.2d 1118, 1124 (10th Cir. 1979).

■ Appellee points out that the government has been equivocal as to what is the point source for the discharges involved in this case. In its briefing on appeal the United States says it is the reserve sump. The statutory definition of a point source is:

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

33 U.S.C. § 1362(14). Earth Sciences emphasizes the references to "conveyance" declaring it must mean a ditch or pipe or some instrument intended to be used as a conduit. The government emphasizes the terms "well," "container" and references to a concentrated feeding operation as a point source. It relies upon the dictionary definition of "sump" as a pit or well in which liquids collect. We have no problem finding a point source here. The undisputed facts demonstrate the combination of sumps, ditches, hoses and pumps is a circulating or drainage system to serve this mining operation.

The usage of the reserve sump here fits the Webster's Third New International Dictionary (1976) definition of "sump pit" as "a pit at the lowest point in a circulating or drainage system." Despite the large capacity (168,000 gallons for the reserve sump) we view this operation as a closed circulating system to serve the gold extraction process with no discharge. When it fails because of flaws in the construction or inadequate size to handle the fluids utilized, with resulting discharge, whether from a fissure in the dirt berm or overflow of a wall, the escape of liquid from the confined system is from a point source. Although the source of the excess liquid is rainfall or snow melt, this is not the kind of general runoff considered to be from nonpoint sources under the FWPCA.

## III

■ Earth Sciences' second argument is that 33 U.S.C. § 1311(a) is written so that only the *intentional* discharges of pollutants are unlawful: since the overflow of the reserve sump in this case was accidental, the Act does not apply. The regulatory provisions of the FWPCA were written without regard to intentionality, however, making the person responsible for the discharge of any pollutant strictly liable. 33 U.S.C. § 1362(12) defines discharge of pollutants as "*any* addition of *any* pollutant to navigable waters from any point source." (Emphasis added.) Willful or negligent violations of the Act are separately.punishable by criminal penalties under 33 U.S.C. § 1319(c)(1). The Act would be severely weakened if only intentional acts were proscribed. We will not interpret it that narrowly, particularly when the legislative history is clear Congress intended strong regulatory enforcement. Consequently, Earth Sciences' contention is without merit.

## IV

■ It is argued that the Rito Seco is not a "navigable water" subject to regulation under the Act. At first blush that argument appears to be plausible. It was stipulated by the parties that the Rito Seco is not navigable in fact nor is it used to transport any goods or materials. It is located entirely in Costilla County, Colorado, and below this operation are two reservoirs which collect all of the stream flow to be used for recreation and agricultural irrigation.

Earth Sciences would have us review this Act in terms of the traditional meaning of "navigable waters," as construed in the line of cases beginning with *The Daniel Ball,* 77

U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871). But the conference committee resolving differences between the Senate and House versions of the FWPCA in 33 U.S.C. § 1362(7) eliminated the word "navigable" from in front of "waters" in the House bill; thus "navigable waters" was defined as "the waters of the United States, including the territorial seas." The conference report noted the change and declared the term should "be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." Sen.Conf.Rep.No.92–1236, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News pp. 3668, 3776, 3822.

It is stipulated by the parties that the stream supports trout and some beaver; the water collected in the reservoir is used for agricultural irrigation, and the resulting products are. sold in interstate commerce. It seems clear Congress intended to regulate discharges made into every creek, stream, river or body of water that in any way may affect interstate commerce. Every court to discuss the issue has used a commerce power approach and agreed upon that interpretation.

Particularly useful is the extended discussion of the issue in *United States v. Ashland Oil and Transp. Co.,* 504 F.2d 1317 (6th Cir. 1974). That court held the FWPCA navigable waters definition extended to waters nonnavigable in the traditional sense, and that definition was within Congress' constitutional powers under the commerce clause. Bodies of water less substantial than the Rito Seco have been held to be under the ambit of the Act. *See Appalachian Power Co. v. Train,* 545 F.2d 1351 (4th Cir. 1976); *P.F.Z. Properties, Inc. v. Train,* 393 F.Supp. 1370 (D.D.C.1975); *United States v. Holland,* 373 F.Supp. 665 (M.D.Fla. 1974). Earth Sciences argues the Rito Seco does not provide a very significant link in the chain of interstate commerce. The stipulation of facts indicates at least some interstate impact from this stream and that is all that is necessary under the Act. We hold the Rito Seco is covered by the FWPCA's definition of navigable waters.

## V

Finally, Earth Sciences challenges the government's right to bring a civil action after pursuing administrative remedies. The only justification for a civil action after issuance of an EPA order, Earth Sciences asserts, is non-compliance with that order. The complaint filed by the government in this case does not allege Earth Sciences failed to comply with the EPA order, but seeks civil damages.

The pertinent section of FWPCA is 33 U.S.C. § 1319(a)(3) which enables the EPA to "issue an order requiring such person to comply with such section or requirement, *or* he shall bring a civil action . . . ." (Emphasis added.) The disjunctive "or" is interpreted literally by Earth Sciences as requiring a choice by the EPA to pursue only one remedy, furthering a Congressional intent to eliminate duplicative actions. Consequently, states are encouraged to seek compliance and only if the state enforcement is insufficient is EPA to enter the case. § 1319(a)(1).

This argument gave us some pause because "or" is normally read in a disjunctive sense, signifying alternatives. Nevertheless, as noted in *De Sylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 976, 100 L.Ed. 1415 (1956):

> We start with the proposition that the word "or" is often used as a careless substitute for the word "and"; that is, it is often used in phrases where "and" would express the thought with greater clarity. That trouble with the word has been with us for a long time: see, *e. g., United States v. Fisk,* 3 Wall. 445, 18 L.Ed. 243.

Two district courts have. dealt with this issue, holding the statute did not restrict the EPA to mutually exclusive alternatives. In *United States v. Detrex Chemical Indus., Inc.,* 393 F.Supp. 735, 738 (N.D.Ohio 1975), the court stated:

> To rule otherwise, would reward violators of the Act by forgiving penalties incurred where the administrator has invoked this

congressionally approved procedure, thereby effectively discouraging the utilization of said procedure.

*See also, United States v. Eastern Associated Coal Corp.,* 11 E.R.C. 1381 (W.D.Pa.1977).

It is plainly inconsistent with the strong enforcement policy of the Act to declare the EPA must choose between prevention of future pollution discharges and punishment of past violations through civil penalties. The administrator needs both sanctions. Sen.Rep.No.92–414, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, p. 3731, accompanying the bill, at least inferentially supports the conclusion Congress intended both to be available. We hold the argument the EPA is limited to one remedy must be rejected. Thus we reject the alternate defenses of the district court judgment, and remand the cause for further proceedings consistent herewith.