**STATE OF UTAH, By and Through its DIVISION OF PARKS AND RECREATION, Plaintiff-Appellant,**

v.

**John O. MARSH, Secretary of the Army; et al., Defendants-Appellees.**

No. 81–1528.

United States Court of Appeals, Tenth Circuit.

Aug. 3, 1984.

---

Dallin W. Jensen, Asst. Atty. Gen. of the State of Utah, Salt Lake City, Utah (David L. Wilkinson, Atty. Gen., Richard L. Dewsnup and Michael M. Quealy, Asst. Attys. Gen., Salt Lake City, Utah, were on brief), for plaintiff-appellant.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C. (Brent D. Ward, U.S. Atty., Salt Lake City, Utah, and Carol E. Dinkins, Asst. Atty. Gen., Dirk D. Snel and Fred R. Disheroon, Attys., Dept. of Justice, Washington, D.C., were also on brief), for defendants-appellees.

Before SETH, Chief Judge, and HOLLOWAY and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

The question before us is whether Congress is empowered under the Commerce Clause of the United States Constitution to regulate the discharge of dredged or fill material into Utah Lake, when the waters of the lake are not capable of bearing interstate navigation but are otherwise used to sustain and foster interstate commerce. The trial court granted summary judgment in favor of the federal defendants, and plaintiff, the State of Utah, appeals. We affirm.

I

The facts of this case are not in dispute. Utah Lake is the largest freshwater lake in the State of Utah, with a surface area of approximately 150 square miles. Originally a natural lake, it has been developed into a storage reservoir through the construction of a dam at the point where the Jordan River, the outlet stream, leaves the lake. It is also referred to as the "hub" of the Bonneville Unit of the Central Utah Project, a plan to collect, develop, and divert water in the Bonneville and Uinta Basins of central Utah for municipal, industrial, agricultural, and recreational purposes.[1] Water flows into the lake from tributary streams in the Upper Jordan River Basin, ground water from underground basins, precipitation on the lake proper, and some return flow from irrigation imports from the Colorado River and the Weber River drainage. Although more than half of this water is lost through evaporation, about 200,000 acre-feet of it is delivered down the Jordan River to irrigation canals and to

---

1. *See generally Sierra Club v. Stamm,* 507 F.2d 788, 789 (10th Cir.1974) (describing Central Utah Project and Bonneville Unit). The function of Utah Lake in this project will be to permit exchanges for the municipal and industrial system, to salvage winter loss by means of diking, and to recycle return flows from new project water brought into the Utah Lake basin. II R. 17.

industry. Part of it spills or is waste water running down the Jordan River to the Great Salt Lake. II R. 5–12, 17, 35; Defendants' Exhibit 1, at 151, 181.

The State of Utah, through its Division of Parks and Recreation, owns and operates Utah Lake State Park, located on the east shore of Utah Lake. The park facilities include a marina and a recreational boat harbor. In the winter of 1978–1979, the Division of Parks and Recreation installed several new concrete boat launching ramps, and in doing so placed a small cofferdam across the mouth of the boat harbor. After the boat ramps were constructed, the cofferdam was removed, and the dam material was deposited on the other side of the harbor as a base for an extension of a parking lot. I R. 4; Appellant's Brief 2–3.

In April 1979, the Division of Parks and Recreation received a letter from the District Engineer of the Army Corps of Engineers stating that the placement and subsequent removal of the cofferdam constituted a violation of the Clean Water Act, 33 U.S.C. § 1344, in that the State had failed to obtain a permit for the placement of fill material in Utah Lake, a body of water over which the Corps claimed jurisdiction as "waters of the United States." I R. 4–5.

In May 1979, the State of Utah commenced this action against the Secretary of the Army, the Chief of Engineers, and subordinate federal officers. The complaint alleged, in substance, that Utah Lake is a navigable body of water located entirely within Utah, with no navigable tributary or outlet extending beyond the borders of the State of Utah, and that as such Utah Lake "is beyond the constitutional reach of the regulatory authority of Congress." I R. 2. The complaint further asserted that the Corps of Engineers was claiming regulatory jurisdiction over the lake, when the Corps notified the State that a permit should have been obtained prior to remov-

ing an unpermitted cofferdam in Utah Lake and placing the removed material below the lake's ordinary high water elevation. The complaint requested the district court to enter a judgment declaring that the Corps has no lawful regulatory authority or jurisdiction in, on, or around Utah Lake and, in addition, to enter an order enjoining defendants from interfering with the State's operations and activities in, on, and around Utah Lake.

The federal defendants filed an answer denying that the Corps of Engineers lacked regulatory authority over Utah Lake. I R. 7. Thereafter, both sides filed motions for summary judgment, but were unable to agree on a stipulation of relevant facts. Id. at 13–14, 19, 26, 31. Accordingly, the district court issued an order requiring an evidentiary hearing and stating that under United States v. Earth Sciences, Inc., 599 F.2d 368 (10th Cir.1979), the relevant factual issue to be determined at such hearing was whether Utah Lake affected interstate commerce. I R. 31–32.

At the evidentiary hearing the Corps was the only party to produce testimony, and none of its evidence was rebutted by the State. The evidence purported to show that Utah Lake affects interstate commerce because, inter alia, the lake is used by interstate travelers for public recreation, and waters from the lake are used for irrigating crops sold in interstate commerce. Further, the lake supports a commercial fishery which markets the bulk of its product out of state. Utah did not attempt to controvert any of the evidence presented by the federal defendants, because it deemed such evidence to be irrelevant to the basic constitutional issues raised in this case. Appellant's Brief 5.

Following the hearing, the district court entered an order finding that "33 U.S.C. Section 1344 is constitutional and that Utah Lake affects interstate commerce ...."[2]

2. Although Fed.R.Civ.P. 56 is silent on the point, Rule 43(e), which authorizes the use of oral testimony on motions generally, has been held to be applicable to motions for summary judgment. See, e.g., Carter v. Newsday, Inc., 528 F.Supp. 1187, 1195 (E.D.N.Y.1981); cf. Walters v. City of Ocean Springs, 626 F.2d 1317, 1322 (5th Cir.1980) (per curiam) (plaintiff failed to invoke trial court's discretionary power to hear oral testimony at summary judgment hearing).

The court entered summary judgment in favor of the federal defendants, and dismissed the complaint.

This appeal followed.

## II

The statutory framework governing this case is the Federal Water Pollution Control Act (FWPCA or the Act), 33 U.S.C. §§ 1251–1376 (1976 & Supp. II 1978). The objective of the Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." FWPCA § 101(a), 33 U.S.C. § 125i(a). As part of a comprehensive plan to achieve these goals, Congress provided, in § 301(a) of the FWPCA, 33 U.S.C. § 1311(a), that the discharge of any pollutant by any person[3] shall be unlawful unless it is made in compliance with § 301 and other specified provisions of the Act. One of these specified provisions is § 404, 33 U.S.C. § 1344. Section 404(a) provides that the Secretary of the Army, acting through the Chief of Engineers, may issue permits for the discharge of dredged or fill material into the "navigable waters" at specified disposal sites, subject to certain guidelines and procedures. Section 404(f)(2) provides that:

Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

As defined in § 502(7) of the Act, 33 U.S.C. § 1362(7), the term "navigable waters" means "the waters of the United States, including the territorial seas."[4] It is generally agreed that Congress, by adopting this definition, intended to assert federal jurisdiction over the nation's waters to the maximum extent permissible under the Constitution, unlimited by traditional concepts of navigability. *See United States v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir.1979); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 375 (10th Cir.1979); *United States v. Lambert*, 695 F.2d 536, 538 (11th Cir.1983); *Deltona Corp. v. United States*, 657 F.2d 1184, 1186, 228 Ct.Cl. 476 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *United States v. Byrd*, 609 F.2d 1204, 1209 (7th Cir.1979); *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 754–55 (9th Cir.1978); *Minnesota v. Hoffman*, 543 F.2d 1198, 1200 n. 1 (8th Cir.1976), *appeal dismissed*, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977).

Utah's brief says that the State accepts the decisions of the lower federal courts to

---

*See generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2723, at 61 (1983). In any event, no claim of error is asserted in connection with the procedure followed by the district court.

3. The term "person" is defined by the Act to include the States and their political subdivisions. FWCPA § 502(5), 33 U.S.C. § 1362(5).

4. The Corps of Engineers has implemented this definition as follows:

(a) The term "waters of the United States" means:

(1) The territorial seas with respect to the discharge of fill material....

(2) Coastal and inland waters, lakes, rivers, and streams that are navigable waters of the United States, including adjacent wetlands;

(3) Tributaries to navigable waters of the United States, including adjacent wetlands (manmade nontidal drainage and irrigation ditches excavated on dry land are not considered waters of the United States under this definition).

(4) Interstate waters and their tributaries, including adjacent wetlands; and

(5) *All other waters of the United States not identified in paragraphs (1)–(4) above, such as isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce.*

The landward limit of jurisdiction in tidal waters, in the absence of adjacent wetlands, shall be the high tide line and the landward limit of jurisdiction and all other waters, in the absence of adjacent wetlands, shall be the ordinary high water mark.

33 C.F.R. § 323.2(a) (1978) (footnotes omitted) (emphasis added).

the effect that Congress "implemented the full width, breadth and thrust of the Commerce power, unlimited by any concept of navigability. What Utah is not willing to accept in those decisions is the legal conclusion that Section 404 is within the constitutional bounds of the Commerce Clause." Appellant's Brief 58–59. The State contends that the reach of congressional power under the Commerce Clause does not extend to Utah Lake because that lake has no navigable connection in interstate commerce and the lake, by itself, does not affect interstate commerce. This conclusion, it asserts, is compelled by a line of Supreme Court cases dating from *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), *The Montello*, 78 U.S. (11 Wall.) 411, 20 L.Ed. 191 (1870), and others, which deal with the federal regulation of navigable waters.[5]

We must disagree. Article I, § 8, cl. 3, confers on Congress the power "[t]o regulate Commerce ... among the several States ...." "Thus the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964); *see Wickard v. Filburn*, 317 U.S. 111, 124–25, 63 S.Ct. 82, 88–89, 87 L.Ed. 122 (1942); *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942); *see also Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264, 310–13, 101 S.Ct. 2352, 2391–92, 69 L.Ed.2d

1 (1981) (Rehnquist, J., concurring). This is so irrespective of whether such an effect is what at some earlier time was defined as "direct" or "indirect." *Wickard*, 317 U.S. at 125, 63 S.Ct. at 89. Moreover, the triviality of an individual's act is irrelevant so long as the class of such acts might reasonably be deemed nationally significant in their aggregate economic effect. *See Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975); *Katzenbach v. McClung*, 379 U.S. 294, 300–01, 85 S.Ct. 377, 381–82, 13 L.Ed.2d 290 (1964); *Wickard*, 317 U.S. at 127–28, 63 S.Ct. at 90–91. *See generally* L. Tribe, *American Constitutional Law* 236–37 (1978).

With these standards in mind, we conclude that the discharge of dredged or fill material into Utah Lake by plaintiff or others could well have a substantial economic effect on interstate commerce. As noted, Utah Lake is the largest freshwater lake in the State of Utah and is the hub of the Bonneville Unit of the Central Utah Project. Waters from Utah Lake are used to irrigate crops which are sold in interstate commerce, II R. 40, and the lake supports the State's most valuable warm water fishery which markets most of the catch out of state. *Id.* at 58–59; Defendants' Exhibit 1, at 134, 151. The lake also provides recreationists with opportunities to fish, hunt, boat, water ski, picnic, and camp, as well as the opportunity to observe, photograph, and appreciate a variety of bird and animal life; non-resident visitation at the lake has averaged 6,919 persons per year, or 2% of total visitation, over the 1967–1980 period. II R. 51–53; Defendants' Exhibit 1, at 151; Defendants' Exhib-

---

**5.** We are mindful of our decision in *Hardy Salt Co. v. Southern Pacific Transportation Co.*, 501 F.2d 1156, 1169 (10th Cir.), *cert. denied*, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974), which held that "a navigable water of the United States within the meaning of Sections 9, 10 and 13 of the Rivers and Harbors Act must be construed in line with the interpretation in The Daniel Ball, as contemplating such a body of water forming a continued highway over which commerce is or may be carried on with other states or foreign countries, by water." *Hardy Salt,*

however, concerned the Rivers and Harbors Act, not the FWPCA, and reached no question of constitutional power. *United States v. Ashland Oil & Transportation Co.*, 504 F.2d 1317, 1324 n. 2 (6th Cir.1974). Moreover, "[i]t is clear from the legislative history of the FWPCA that for the purposes of that Act, Congress intended to expand the narrow definition of the term 'navigable waters,' as used in the Rivers and Harbors Act." *Leslie Salt Co. v. Froehlke*, 578 F.2d at 754 (footnote omitted).

it D–4. Such interstate movement of travelers has been held to be within the reach of the Commerce Clause. *See Heart of Atlanta Motel,* 379 U.S. at 256, 85 S.Ct. at 356. Finally, the lake is on the flyway of several species of migratory waterfowl which are protected under international treaties. II R. 63, 68–70; Defendants' Exhibit 5.

We have previously upheld the Corps of Engineers' jurisdiction on facts less substantial than these. In *United States v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir.1979), the Government brought suit against a mining company pursuant to § 301(a) of the FWPCA, 33 U.S.C. § 1311(a), alleging that the company had violated the Act by discharging pollutants into the Rito Seco Creek without a permit. The mining company attempted to defend on the ground, *inter alia,* that the Rito Seco was not a "navigable water" subject to regulation because it was located entirely within one county in Colorado, and was not used to transport any goods or materials. This court noted, *inter alia,* that the waters of the creek were used for agricultural irrigation and that the resulting products were sold in interstate commerce, and held that the Rito Seco was covered by the FWPCA's definition of navigable waters. 599 F.2d at 375.

As noted, here the State of Utah challenges the constitutionality of such exercise of Commerce Clause power. In *Earth Sciences,* we alluded to the holding in *United States v. Ashland Oil & Transportation Co.,* 504 F.2d 1317, 1328–29 (6th Cir. 1974), that the FWPCA Amendments of 1972 are a constitutional exercise of congressional power under the Commerce Clause. *See also United States v. Byrd,* 609 F.2d 1204, 1209–11 (7th Cir.1979) (extension of FWPCA jurisdiction to cover filling activities adjacent to inland lake visited by interstate travelers, within Commerce Clause power). Although the Supreme Court has not squarely addressed the constitutional issue before us, in *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.,* 452 U.S. 264, 282 & n. 21, 101 S.Ct. 2352, 2363 & n. 21, 69 L.Ed.2d 1 (1981), it referred to *Ashland Oil, Byrd,* and similar cases and stated: "[W]e agree with the lower federal courts that have uniformly found the power conferred by the Commerce Clause broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State."

We have carefully reviewed the navigability cases cited by the State of Utah and are not persuaded that they limit Congress' power under the Commerce Clause to regulate activities affecting intrastate waters, where such activities or waters affect interstate commerce. As the Supreme Court stated in *Kaiser Aetna v. United States,* 444 U.S. 164, 174, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979):

> *Appalachian Power Co.* [311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940) ] indicates that congressional authority over the waters of this Nation does not depend on a stream's "navigability." And, as demonstrated by this Court's decisions in *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1 [57 S.Ct. 615, 81 L.Ed. 893] (1937), *United States v. Darby,* 312 U.S. 100 [61 S.Ct. 451, 85 L.Ed. 609] (1941), and *Wickard v. Filburn,* 317 U.S. 111 [63 S.Ct. 82, 87 L.Ed. 122] (1942), a wide spectrum of economic activities "affect" interstate commerce and thus are susceptible of congressional regulation under the Commerce Clause irrespective of whether navigation, or, indeed, water, is involved. The cases that discuss Congress' paramount authority to regulate waters used in interstate commerce are consequently best understood when viewed in terms of more traditional Commerce Clause analysis than by reference to whether the stream in fact is capable of supporting navigation or may be characterized as "navigable water of the United States."

The State of Utah makes a scholarly analysis of the constitutional decisions and presents vigorous arguments challenging the exercise of Governmental authority

over activities at Utah Lake. We are convinced, however, that the challenged application of the Act and the regulations is within the permissible bounds staked out by the Commerce Clause. Accordingly the judgment of the district court is

AFFIRMED.