**RESIDENTS AGAINST INDUSTRIAL LANDFILL EXPANSION (R.A.I.L.E.), Plaintiff,**

v.

**DIVERSIFIED SYSTEMS, INC., Defendant.**

No. CIV-1-91-308.

United States District Court, E.D. Tennessee, at Chattanooga.

Aug. 24, 1992.

Gary A. Davis, Ray, Farmer, Eldridge & Hickman, Knoxville, Tenn., for plaintiff.

R. Louis Crossley, Jr., Long, Ragsdale & Waters, P.C., Knoxville, Tenn., for defendant.

## MEMORANDUM AND ORDER

EDGAR, District Judge.

This matter is before the Court on the motion for permission to file a brief in excess of twenty-five pages of plaintiff Residents Against Industrial Landfill Expansion ("RAILE") (Court File No. 33); the motion for summary judgment of RAILE (Court File No. 20); and the cross motion for summary judgment of defendant Diversified Systems, Inc. ("Diversified") (Court File No. 25). The motion to file a brief in excess of twenty-five pages is GRANTED. For the reasons which follow, RAILE's motion for summary judgment and Diversified's cross motion for summary judgment will be DENIED.

### I. Background

Diversified, a Tennessee corporation, owns and operates an industrial waste landfill in McMinn County, Tennessee. This landfill utilizes two ponds that receive wastewater from the landfill site. RAILE claims that the landfill site is contaminated with pollutants and discharges it into two streams through the two ponds. One pond, pond # 2, on the back side of the landfill, discharges into a small tributary of Rogers Creek that runs across residential property. The other pond, pond # 1, on the front side of the landfill, discharges into a tributary of Meadow Branch, which flows through

farms and residential property and is used for watering livestock.

Diversified has not received a National Pollutant Discharge Elimination System ("NPDES") permit from the Tennessee Department of Conservation, Division of Water Pollution, for the discharges from either of the two ponds. RAILE claims that an NPDES permit is required for such discharges under the Clean Water Act, 33 U.S.C. §§ 1251 to 1376. Because Diversified has no NPDES permit, RAILE is seeking injunctive relief from and civil penalties for the alleged discharges. (Court File No. 1).

## II. Discussion

### A. *Summary Judgment*

Fed.R.Civ.P. 56(c) provides that summary judgment will be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *White v. Turfway Park Racing Ass'n,* 909 F.2d 941, 943 (6th Cir.1990); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *60 Ivy Street,* 822 F.2d at 1435–36.

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White,* 909 F.2d at 943–44; *60 Ivy Street,* 822 F.2d at 1435.

The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

### B. *Service of Complaint on Attorney General*

■ Diversified claims that RAILE did not properly serve a copy of the complaint on the Attorney General of the United States and the Administrator of the EPA in compliance with 33 U.S.C. § 1365(c)(3). Section 1365(c)(3) provides:

> Whenever any action is brought under this section in a court of the United States, the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator. No consent judgment shall be entered in an action in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator.

Under the Rules promulgated by EPA for service of the complaint under § 1365(c)(3), "[a] citizen plaintiff shall mail a copy of a complaint filed against an alleged violator under [1365(c)(3)] to the Administrator of the EPA, the Regional Administrator of the EPA Region in which the violations are alleged to have occurred, and the Attorney General of the United States." 40 C.F.R. § 135.4(a) (1991). RAILE claims that it mailed a copy of the complaint to the Administrator of the EPA and the Attorney General, and Diversified has offered no evidence to refute this except the contention that RAILE should have served the complaint upon the Administrator and Attorney General in compliance with Fed.R.Civ.P. 4. (*See* Court File No. 33). RAILE has properly complied with the service provision under § 1365(c)(3) and need not comply with Fed.R.Civ.P. 4.

### C. *NPDES Permit Requirements*

#### 1. Primary Jurisdiction of EPA

■ Diversified argues that this Court should refrain from exercising jurisdiction

over this matter because it has filed an NPDES permit application for stormwater discharges with the EPA. "Primary jurisdiction is appropriately invoked 'when a claim is cognizable in a court but adjudication of the claim: requires the special competence of administrative bodies created by Congress to regulate the subject matter." *Legal Environmental Assistance Foundation v. Hodel,* 586 F.Supp. 1163, 1168 (E.D.Tenn.1984). To determine whether Diversified discharged pollutants from a point source into navigable waters is not "so suffused by technical and policy considerations" that the exercise of jurisdiction by this Court over this matter will disrupt the administration by the EPA. *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642, 647 (E.D.Penn.1981).

**2. Alleged Clean Water Act Violations**

■ Diversified claims that any discharges from the two ponds are regulated under 33 U.S.C. § 1342(p)—Municipal and Industrial Stormwater Discharges. This section provides that "[p]rior to October 1, 1992, the Administrator or the State shall not require a permit under this section for discharges composed entirely of stormwater" except "[a] discharge associated with industrial activity." 33 U.S.C. § 1342(p)(1) and (p)(2)(B). Diversified claims that it has met the time limit for filing a permit under this section, and therefore, has not violated the act. RAILE claims, however, that the discharges from the two ponds on Diversified's property do not fall under the stormwater provisions, but under the general proscription against discharges of pollutants from point sources without a permit. *See* 33 U.S.C. § 1311(a).

The enactment of § 1342(p), however, was in reaction to a previous exclusion from the NPDES permit requirements for point source discharges of pollutants, for "administrative infeasibility," of uncontrolled discharges composed entirely of storm runoff when the discharges are uncontaminated by any industrial or commercial activity. *See NRDC v. EPA,* 966 F.2d 1292 (9th Cir.1992); *American Mining Congress v. EPA,* 965 F.2d 759 (9th Cir. 1992); *NRDC v. Costle,* 568 F.2d 1369 (D.C.Cir.1977). Section 1342 applies only to discharges composed *entirely* of stormwater. This regulation does not apply to this case where two ponds store stormwater that contains pollutants from a landfill.

Except in compliance with the Clean Water Act provisions relating to effluent limitations and standards and the NPDES permit system, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(*l*); *see* 33 U.S.C. §§ 1312, 1316, 1317, 1328, 1342, and 1344. The term "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The term "discharge of pollutant" means "any addition of any pollutant to navigable waters from any point source...." 33 U.S.C. § 1362(12)(A).

"Point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The term "navigable waters" means the waters of the United States, including the territorial seas.

Under these provisions, a discharge from either sediment pond on Diversified's property is subject to the NPDES permit scheme. The two ponds are clearly point sources under the Act. "The concept of a point source was designed [to embrace] the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States." *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979).

Notwithstanding that it may result from such natural phenomena as rainfall and gravity, the surface run-off of contaminated waters, once channeled or collected, constitutes discharge by a point

source. When a leachate collection system "fails because of flaws in the construction or inadequate size to handle the fluids utilized, with resulting discharge, whether from a fissure in the dirt berm or overflow of a wall, the escape of liquid from the confined system is from a point source."

*O'Leary*, 523 F.Supp. at 655 (citation omitted) (quoting *Earth Sciences*, 599 F.2d at 374); *see also Sierra Club v. Abston Constr. Co.*, 620 F.2d 41 (5th Cir.1980) (sediment basins designed to catch runoff before it reached a creek from waste of coal strip mining is a point source); *Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991) (culvert that carried seeps of leachate from a landfill was a point source), *cert. denied on other grounds*, —— U.S. ——, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992).

The tributaries that carry the alleged discharge of pollutants from the two ponds are "navigable waters" under the act. Congress did not "use the term 'navigable waters' in the traditional sense; Congress intended to extend the coverage of the act as far as permissible under the commerce clause." *Quivira Mining Co. v. EPA*, 765 F.2d 126, 130 (10th Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *Earth Sciences*, 599 F.2d at 375 ("navigable waters" should be given the broadest possible interpretation). One pond, on the back side of the landfill, discharges into a small tributary of Rogers Creek that runs across residential property. The other pond, on the front side of the landfill, discharges into a tributary of Meadow Branch, which flows through farms and residential property and is used for watering livestock. Certainly, these tributaries of creeks may in some way affect interstate commerce; therefore, they are navigable waters under the Clean Water Act.

The crux of the case involves whether Diversified actually discharged pollutants from the ponds into the two tributaries. The record, however, is unclear about whether the contaminants in the two tributaries are from Diversified's landfill or from the Manville landfill, a now unused, adjacent landfill. The only evidence that directly proves that Diversified released pollutants through either of its two ponds was the picture taken by and testimony of John Dake, a member of RAILE and an area landowner, that sudsy water was coming from Diversified's pond #2. (Court File No. 21, Exhibit D). Diversified analyzed the discharge from its pond #2 and found nonionic detergents were the culprit. The pond was treated with a silicon base defoamer, itself a pollutant under the Clean Water Act, but no more foaming problems have occurred. (Court File No. 21, Exhibit F). This was the only evidence submitted of any direct test results of what is being discharged out of Diversified's landfill. The sudsy water, however, is no longer a problem. It is unclear from the other submitted evidence whether the pollutants in the two tributaries come from come from Diversified or Manville's landfill. RAILE's motion for summary judgment and Diversified's cross motion for summary judgment is DENIED. (Court File Nos. 20 and 25).

SO ORDERED.