The Honorable Jim Milum State Representative 607 Skyline Drive Harrison, AR 72601-2309
Dear Representative Milum:
You have requested an Attorney General opinion concerning the authority of federal agencies to regulate property in Arkansas.
Your questions are:
 (1) Does the federal Environmental Protection Agency have the authority to regulate lands owned by the State of Arkansas or by citizens of Arkansas?
 (2) Does the federal Environmental Protection Agency have the authority to make regulations that would limit the amounts of waste running from lands owned by the State of Arkansas or by citizens of Arkansas into Arkansas' streams and rivers, or any other type of similar authority?
 (3) Does the federal Environmental Protection Agency have authority to make regulations that would limit the amounts of waste running from lands owned by the State of Arkansas or by the citizens of Arkansas into the Buffalo National River?
(4) Does any federal Agency have such power?
You have specifically requested that I explain the constitutional authority for all answers to these questions.
Response
Question 1 — Does the federal Environmental Protection Agency have theauthority to regulate lands owned by the State of Arkansas or by citizensof Arkansas?
It is my opinion that the federal Environmental Protection Agency (EPA) does have the authority to regulate lands owned by the State of Arkansas or by citizens of Arkansas, to the extent that such regulations are within the Agency's general authority to regulate.
The federal EPA was created by Reorganization Plan No. 3 of 1970. Section 1 [Eff. Dec. 2, 1970, 35 F.R. 15623, 84 Stat. 2086, as amended, P.L.98-80, § 2(a)(2), (b)(2), (c)(2)(C), 97 Stat. 485, 486.] This section does not specify particular powers, but rather, makes reference to the power and authority of various predecessor agencies, which was transferred to the EPA. This statement of the EPA's authority is voluminous, and need not be cited in full here. More helpful for purposes of your question is the discussion of the EPA's general role that was contained in the message of the President that accompanied submission of the Reorganization Plan to Congress. It stated:
 Our national government today is not structured to make a coordinated attack on the pollutants which debase the air we breathe, the water we drink, and the land that grows our food. Indeed, the present governmental structure for dealing with environmental pollution often defies effective and concerted action.
 Despite its complexity, for pollution control purposes the environment must be perceived as a single, interrelated system. Present assignments of departmental responsibilities do not reflect this interrelatedness.
* * *
A far more effective approach to pollution control would:
• Identify pollutants.
 • Trace them through the entire ecological chain, observing and recording changes in form as they occur.
• Determine the total exposure of man and his environment.
• Examine interactions among forms of pollution.
 • Identify where in the ecological chain interdiction would be most appropriate.
 In organizational terms, this requires pulling together into one agency [the EPA] a variety of research, monitoring, standard-setting and enforcement activities now scattered through several departments and agencies. It also requires that the new agency include sufficient support elements — in research and in aids to State and local anti-pollution programs, for example to give it the needed strength and potential for carrying out its mission.
The discussion then goes on to list the various agencies whose powers were being transferred to the EPA. In stating the roles and functions of the EPA after the transfer of such powers, the discussion included the following role and function of the EPA, which is pertinent to your question:
 • The establishment and enforcement of environmental protection standards consistent with national environmental goals.
To the extent that the EPA acts within the general parameters outlined above (and of course, within constitutional limits and within the limits of any other applicable law), it may exercise its granted authority as applied to land owned by the State of Arkansas or by the citizens of the State of Arkansas.[1]
The constitutional basis for EPA's authority to regulate the environment emanates, in my opinion, from Congress' general power under the Commerce Clause of the U.S. Constitution. That provision states:
 8. The congress shall have power . . . [3.] To regulate commerce with foreign nations, and among the several states, and with the Indian tribes;
See U.S. Const., art. I, § 8, cl. 3.
It is well established that Congress has the power under the Commerce Clause to regulate environmental matters. See, e.g., United States v.Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985); The DanielBall, 77 U.S. 55, 19 L. Ed. 99, 10 Wall. 557 (1870). See alsoPennsylvania v. Union Gas Co., 491 U.S. 1 (1989). In creating the EPA and delegating to it the authority to regulate environmental matters, Congress acted within its Commerce Clause power.
It should be noted that in the event that a conflict should arise between the regulatory authority of the state and that of the federal EPA, the EPA's regulatory authority will prevail. Under the Supremacy Clause of the United States Constitution, any EPA regulation must take precedence over state regulation, because the EPA regulation has the status of federal law. The EPA is a federal agency, and as such, its regulations are promulgated pursuant to federal statutory law. Article 6, § 2 of the United States Constitution states:
 This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.
U.S. Const., art. 6, § 2.
The U.S. Supreme Court has held that "[t]he phrase `Laws of the United States' [as used in the Supremacy Clause] encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." See City Of New York v. FCC,486 U.S. 57 (1988); Louisiana Public Service Comm'n v. FCC, 476 U.S. 355
(1986).
Accordingly, I conclude that under the Supremacy Clause, the EPA has the authority to regulate land owned by the State of Arkansas or by citizens of the State of Arkansas, provided that it does so within the parameters of its general grant of authority, as discussed above.
Question 2 — Does the federal Environmental Protection Agency have theauthority to make regulations that would limit the amounts of wasterunning from lands owned by the State of Arkansas or by citizens ofArkansas into Arkansas' streams and rivers, or any other type of similarauthority?
It is my opinion, as explained more fully below, that the EPA does have such authority, provided that the "streams and rivers" into which the waste runs can in any way affect interstate commerce, and whether they otherwise come within the EPA's definition of "waters of the United States."
The Federal Water Pollution Control Act, (also known as the Clean Water Act, 33 U.S.C. § 1251 et seq.), is a comprehensive water quality statute. The Act states the following as one of its goals: to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). The Act explicitly empowers the EPA to regulate the addition of pollutant to "navigable waters." See33 U.S.C. §§ 1311(a), 1342, 1362. The Act defines the term "navigable water" as "the waters of the United States." 33 U.S.C. § 1362(7). The Act does not define the phrase "waters of the United States." However, the EPA has formulated a regulatory definition of the phrase. That definition states:
(s) The term "waters of the United States" means:
 (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
(2) All interstate waters including interstate wetlands;
 (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
 (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
 (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
 (iii) Which are used or could be used for industrial purposes by industries in interstate commerce;
 (4) All impoundments of waters otherwise defined as waters of the United States under this definition.
 (5) Tributaries of waters identified in paragraphs (1) through (4) of this section;
(6) The territorial sea;
 (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (s)(1)-(6) of this section; waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.
 Waters of the United States do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.
40 C.F.R. § 230.3(s). (In Hoffman Homes, Inc. v. Administrator, EPA,999 F.2d 256 (7th Cir. 1993), the court held that the EPA did not exceed its power in promulgating the foregoing definition.)
The EPA's definition of "waters of the United States" is broad, but imposes the limitation that the water in question be capable of affecting interstate commerce. It should be noted that this definition is clearly broad enough to encompass bodies of water that are not "navigable" within the traditional understanding of that term. The legislative history of the Clean Water Act indicates that Congress did not intend to limit the application of the Act to "navigable" waters within the traditional meaning of the term. In United States v. Earth Sciences, Inc.,599 F.2d 368 (10th Cir. 1979), the court reviewed that legislative history, as follows:
 Earth Sciences would have us review this Act in terms of the traditional meaning of "navigable waters," as construed in the line of cases beginning with The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871). But the conference committee resolving differences between the Senate and House versions of the FWPCA in 33 U.S.C. § 1362(7) eliminated the word "navigable" from in front of "waters" in the House bill; thus "navigable waters" was defined as "the waters of the United States, including the territorial seas." The conference report noted the change and declared the term should "be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." Sen.Conf.Rep. No. 92-1236, 92d Cong., 2d Sess., Reprinted in (1972) U.S. Code Cong. Admin.News pp. 3668, 3776, 3822.
 It is stipulated by the parties that the stream supports trout and some beaver; the water collected in the reservoir is used for agricultural irrigation, and the resulting products are sold in interstate commerce. It seems clear Congress intended to regulate discharges made into every creek, stream, river or body of water that in any way may affect interstate commerce. Every court to discuss the issue has used a commerce power approach and agreed upon that interpretation.
Earth Sciences, 599 F.2d at 374-75.
The question of whether any particular body of water could affect interstate commerce, and whether it otherwise comes within the EPA's definition of "waters of the United States" will, of course, be a question of fact that can only be answered after a consideration of all relevant evidence. If a factual determination is made that a body of water can affect interstate commerce and that it otherwise comes within the EPA's definition of "waters of the United States," it is my opinion that the EPA would have authority to regulate waste running into that body of water.
I note again that the constitutional basis for the grant of regulatory authority to the EPA is, as discussed previously, the Commerce Clause of the U.S. Constitution.
Question 3 — Does the federal Environmental Protection Agency haveauthority to make regulations that would limit the amounts of wasterunning from lands owned by the State of Arkansas or by the citizens ofArkansas into the Buffalo National River?
For the reasons stated in response to Question 2, it is my opinion that the EPA does have such authority.
Question 4 — Does any federal Agency have such power?
It is my opinion that because the EPA is expressly empowered to work in conjunction with other federal agencies, see 33 U.S.C. § 1252, some such agencies may, under certain circumstances, have some degree of regulatory authority over Arkansas' streams and rivers. Id. For example, the U.S. Army Corps of Engineers exercises a certain amount of authority over bodies of water. See, e.g., 33 U.S.C. § 1344 (authorizing Corps of Engineers to issue permits for discharge of dredged or fill materials into navigable waters at specified disposal sites). Whether a particular agency has regulatory authority over an Arkansas body of water will depend upon the facts of the circumstances and the matter to be regulated. For this reason, I cannot make a general statement regarding the regulatory authority of other federal agencies over Arkansas' waterways. Nevertheless, I am able to conclude generally that federal agencies other than the EPA can, under certain circumstances, exercise regulatory authority over Arkansas' rivers and streams.
If such agencies are given regulatory authority in certain instances, that grant of authority by Congress to that agency, would, as discussed previously, be based upon Congress' power under the Commerce Clause.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:SA/cyh
[1] I find nothing in the history of the EPA or the cases interpreting its authority that would indicate that a distinction should be made between the EPA's authority to regulate land owned by private parties and land owned by the states.