Thomas J. JEFFREY et al., Plaintiffs,

v.

KN ENERGY, INC., Defendant.

Civ. A. Nos. 83–K–1876, 85–K–814.

United States District Court,
D. Colorado.

Jan. 27, 1987.

Spencer T. Denison, William D. Watson, and Jeffrey M. Travis, Holme Roberts & Owen, Denver, Colo., for plaintiffs.

Robert L. Morris, and P. Kathleen Lower, Morris & Lower, Denver, Colo., James A. Miller, K N Energy, Inc., Lakewood, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

### INTRODUCTION

This action is an unorganized diversity-based contract dispute. Plaintiffs are sellers of natural gas under contract with buyer KN Energy. The parties differ over interpretation and application of various provisions of their agreements. I have al-

---

ready twice turned my attention to the controversy in the form of a memorandum opinion and order. Plaintiffs now move for partial summary judgment on their second claim for relief and on KN's first counter-claim. The motion devolves into two is-sues.

Plaintiffs, sellers of natural gas, first "request a partial summary judgment in the form of a declaratory ruling establish-ing that KN is not entitled to reduce its take-or-pay obligation before the first deliv-erability test." Plaintiffs' Brief in Support of Motion for Partial Summary Judgment at 4.

Plaintiffs also request partial summary judgment as to the date on which KN's take-or-pay obligation commenced on the five "Yuma" wells. These wells have the following designations: Conrad # 3, Kitz-miller # 2, # 7, & # 8, and Lett # 1.

In resolving this motion, I shall apply the appropriate standards dictated by Fed.R. Civ.P. 56, as judicially construed, and prin-ciples of contract law. *See Lowell Staats Mining Co. v. Pioneer Uravan*, 596 F.Supp. 1428, 1430 (D.Colo.1984). The de-liverability test issue will be considered first.

## DELIVERABILITY AND THE TAKE–OR–PAY OBLIGATION

Article II of gas contract P–4176 embod-ies the "take-or-pay" provisions in effect between buyer and seller. Take-or-pay ob-ligates KN to take a certain minimum vol-ume of gas each year. If, as buyer has explained, KN

> has taken less than the minimum amount of gas required by the contract, there is a "deficiency." KN must pay for the gas represented by that deficiency. It may make up the deficiency by taking the gas at a later time. If KN has taken more than the minimum amount of gas, any excess take above the minimum is considered "make-up" gas, *i.e.*, gas that is taken to make up deficiencies from previous years.

KN's Response Brief, at 6–7, n. 4.

The size of KN's minimum obligation to take gas is determined by the terms of sections 2 and 3 of Article II. Section 2, in its entirety and as amended by the parties, contains this language:

> *Section 2. Buyer's Obligation to Pur-chase Gas.* Subject to the other provi-sions of this Article II, Buyer agrees to purchase and receive from Seller's well or wells a daily quantity of gas, averaged over each year, which shall be the lesser of the following sub-Section (a) or sub-Section (b). For wells completed on or prior to January 1, 1978, and suitable for connection as determined in Section 10 of this Article II, such obligation shall com-mence on January 1, 1978 or upon the date of initial delivery, whichever occurs first. For wells completed subsequent to January 1, 1978, and which are suitable for connection, Buyer's obligation shall commence ninety (90) days after the well or wells are determined to be suitable for connection or upon the date of initial delivery whichever occurs first:
>
> (a) One Hundred Fifty (150) MCF per day per well.
>
> (b) In the event said wells are prorated by a properly constituted authority hav-ing jurisdiction, the annual allowable vol-ume allocable to Seller's interest in each well or wells connected hereunder divid-ed by the number of days in the year. If such an allowable is imposed, Buyer will nominate as its market requirement at least the volume which Buyer would oth-erwise be required to purchase in the absence of such order. If such order requires nominations to be made by pro-ducers, Buyer will advise Seller of the volume to be so nominated, and Seller shall nominate that volume.
>
> Notwithstanding the above, Buyer shall not incur any minimum take or pay obli-gation for gas under this Section 2 attrib-utable to any well which in Buyer's opin-ion is not suitable for connection as de-termined in accordance with Section 10 of this Article.

Section 3 of Article II, entitled "Reduction in Buyer's Obligation," posits:

> If at any time any well connected hereunder does not have a delivery capacity of at least one hundred and fifty percent (150%) of the required purchases under Section 2 of this Article II, then the required total purchases for said well or wells shall be reduced to a quantity equivalent to sixty-six and two-thirds percent (66⅔%) of the delivery capacity of said well or wells. The delivery capacity of a well hereunder shall be the lesser of the maximum quantity which can be withdrawn daily from the well subject to any valid statutes or rules, orders, and regulations of any state or federal regulatory body, or the daily quantity of gas which the well is able to produce on the 30th day of a 30–consecutive day test (or the daily quantity of the last day of three (3) days of stabilized flow from the well if stabilized flow can be obtained in less than 30 days) against a wellhead pressure of not less than 50% of the average shut in pressure for all wells in the same common source of supply connected to Buyer's Yuma County, Colorado gathering system. Such delivery tests will be run at the request of either party.

Succinctly put, plaintiffs construe these provisions to require KN to take a minimum of 150 MCF of gas,[1] per day per well, unless and until a section 3 deliverability test has been performed. The argument follows the basic thrust of sections 2 and 3. Section 2(a) requires KN to purchase the 150 MCF. Section 3 provides for reduction of that amount of gas only upon establishment, by appropriate testing, of diminished well delivery capacity. Thus, argue plaintiffs, in the absence of a deliverability test, KN's take-or-pay liability must be based on the 150 MCF minimum.

A potential problem with this argument lurks in a dispute over the exact language of section 3. KN contends the first sentence of the section should end with the phrase "attributable to Sellers' interest."[2] Plaintiffs aver the parties agreed to remove that phrase, but KN disagrees. Plaintiffs' Motion for Partial Summary at 3, n. 1. Thus, a factual dispute over the content of relevant contractual language would appear to preclude legal construction of that language.

Plaintiffs, however, perceive no bar. In their view, the reduction of the minimum amount cannot, and does not, come into play until a test has been conducted. Plaintiffs argue that even if the parties had agreed to reduce the take-or-pay obligation according to the percentage ownership interests held in various wells, KN "would not be entitled to reduce the obligation from 150 MCF per day for any reason until a deliverability test was conducted." Plaintiffs' Motion at ¶ 7.

■ I agree with this interpretation of section 3. KN also agrees, in the abstract. KN's Response at 2. However, KN points to "evidence of a course of performance by the parties that explains, modifies or waives the contract language relied upon by plaintiffs." *Id.* Specifically, plaintiffs may have adopted the position that, pending a deliverability test, KN's take-or-pay obligation should only encompass plaintiffs' *pro rata* share of 150 MCF. *See* Exhibits 1, 2 and 3 attached to KN's brief. This evidence raises a genuine issue of material fact as to plaintiffs' waiver, under Colo.Rev.Stat. §§ 4–2–208(3) and 4–2–209(4), of the legal interpretation they now ask me to enforce. Accordingly, partial summary judgment on the issue of reduction of take-or-pay liability is not appropriate at this time.

---

**1.** Neither party has addressed the potential applicability of section 2(b). Plaintiffs apparently believe the minimum volume should be 150 MCF, and KN has been silent on the issue. I therefore assume section 2(b) is not relevant here. However, if section 2(b) has pertinent application to this motion, then the parties should immediately focus my attention to that fact.

**2.** This language would reflect the partial ownership interest, as opposed to 100% ownership status, which plaintiffs possess in some of the wells at issue. Plaintiffs' ownership interests range from about 6% to 100%. Affidavit of Terry G. Marsden at ¶ 3.

## COMMENCEMENT OF THE TAKE–OR–PAY OBLIGATION ON THE YUMA WELLS

Plaintiffs also request partial summary judgment regarding the date take-or-pay liability commenced on the five Yuma wells. Under the applicable portion of Article II, section 2, KN's obligation to take gas "shall commence ninety (90) days after the well or wells are determined to be suitable for connection or upon the date of initial delivery whichever occurs first."

Under Article II, section 10, KN enjoys the power to determine the suitability of a well for connection:

*Section 10. Well information.* Within thirty (30) days after the completion of each well hereunder Seller shall furnish to Buyer all basic data which Seller has available and which is reasonably required for Buyer to determine reserves, deliverability and other factors necessary to ascertain the suitability of that respective well for connection hereunder. Within thirty (30) days after Buyer receives said basic data Buyer shall notify Seller whether or not the respective well for which such data is furnished is suitable for connection hereunder; and if Buyer shall fail, within said thirty (30) day period, to so notify Seller then that respective well shall be deemed to be not suitable for connection.

Plaintiffs contend KN accepted each of the five Yuma wells for connection in 1979, and so seek a judgment that KN's take-or-pay liability on those wells began to accrue ninety days after that suitability determination had been made. *See* Plaintiffs' Brief at 3; Exhibit B attached to Affidavit of Joe Gray. Adopting a contrary position, KN declares it "did not accept the five wells for connection to its gathering system in 1979, .... On the contrary, KN determined that the wells were *not* suitable for connection." KN's Response Brief at 8 (emphasis in original). Affidavit of Ron Tipton at ¶ 3.

According to Tipton, KN accepted gas from the Yuma wells pursuant to a separate albeit formal gathering agreement between the two sets of parties. *Id.* at ¶ s 3, 4; KN's Response Brief at 9. Under the terms of this agreement, KN would not be liable for take-or-pay obligations until delivery of gas commenced. Delivery started in 1981. Thus, KN claims its take-or-pay obligations on the Yuma wells originated in 1981.

The gathering agreement was executed under the authority of Article IV, section 2 of the gas contract. KN's Response Brief at 8. In applicable part, that section states:

*Section 2. Facilities.*

\*    \*    \*    \*    \*    \*

(b) Buyer shall provide or cause to be provided gathering facilities from those wells which in Buyer's sole opinion have sufficient recoverable gas reserves and deliverability to justify the installation of such facilities.... If Buyer refuses to connect any well within ninety (90) days after the later of the effective date of this Contract or the date such well is equipped and ready to deliver gas, Buyer shall notify Seller of its intention and Seller may install the facilities which are necessary to deliver such gas to Buyer's nearest gathering line having capacity available to handle such gas and Buyer agrees to accept delivieries of such gas subject to the other terms of this Contract; provided Buyer shall not be obligated to accept any minimum volumes of gas and shall pay only for that gas actually accepted.

Under this provision, KN is normally responsible for providing gathering facilities. However, if KN enforces its right to refuse to connect a well and properly notifies plaintiffs of that fact, then plaintiffs may provide their own gathering facilities. If plaintiffs do exercise that option, then KN must purchase the gas delivered. However, KN's purchase of such gas is not subject to the take-or-pay obligation. KN need only pay upon delivery.

In the formal gathering agreement, Tipton apparently

went farther than he was required to under the contract: he agreed to accept

the five wells for connection to KN's system, which would allow the wells to be included in calculating KN's take-or-pay obligation. Commencement of the take-or-pay obligation was contingent, however, on the execution of a gathering agreement with plaintiffs and upon initial delivery of gas from the wells.

KN's Response Brief at 9, referring to ¶ 4 of the Tipton Affidavit.

The formal gathering contract, therefore, appears to have been a codification of a modified version of events contemplated by Article IV, section 2.

According to Tipton, "KN did make take or pay payments on some or all of the [Yuma] wells in 1979 and 1980." Tipton Affidavit at ¶ 6. However, swears Tipton, these unwarranted payments were the result of administrative confusion between KN's gas acquisitions department in Lakewood and the accounting department in Kansas. *Id.;* KN's Response Brief at 10. Tipton avers that upon studying the situation in 1983 he "concluded that the take or pay obligation on the wells was the date of initial delivery of gas, because of the fact that the wells were connected to a gathering system other than KN's system." Tipton Affidavit at ¶ 6; Exhibit B–2 to Joe Gray Affidavit. Tipton apparently believes the gathering agreement falls within the purview of Article IV, section 2 since that section authorizes plaintiffs' provision of gathering facilities.

■ I conclude a genuine issue of material fact exists concerning the terms of take-or-pay liability under an agreement modelled on Article IV, section 2 of the gas contract.[3] Section 2 of Article IV clearly envisions an alteration of take-or-pay liability when the seller of gas provides gathering facilities as a result of KN's refusal to accept a well.[4] The Tipton affidavit adequately raises the specter of such an alteration. Therefore, I cannot grant plaintiffs' motion for summary judgment on this issue either.

In light of the foregoing, IT IS ORDERED that:

1. Plaintiffs' motion for partial summary judgment on its second claim for relief and on KN's first counterclaim is denied, in its entirety, without prejudice.

2. If, upon consideration of the additional evidence, or upon further consideration of the available evidence, either party in good faith believes it can resolve the factual disputes noted in this opinion, then that party may move for summary judgment. I court will, if necessary, consider holding an evidentiary hearing to resolve any factual dispute and may render a dispositive legal conclusion at that time.[5] Such a hearing would reduce the number and complexity of legal issues remaining for trial.

---

**3.** I am puzzled by KN's failure to attach a copy of the formal gathering agreement, which Tipton states was executed on October 13, 1980. Tipton Affidavit at ¶ 5. I urge KN to do so.

**4.** I therefore reject plaintiffs' blanket submission "that actual connection of the wells was solely KN's responsibility under the Contract and that any factual questions concerning when or how that connection occurred are totally irrelevant to the issue at hand." Plaintiff's Brief at 3.

**5.** I may hold such a "mini-trial" on the issue(s) presented on a motion for summary judgment pursuant to the authority of Fed.R.Civ.P. 43(e). *See State of Utah v. Marsh,* 740 F.2d 799, 801, n. 2 (10th Cir.1984).